The CELOTEX CORPORATION,
PITTSTON PLANT, HARDING,
PENNSYLVANIA, Appellant,

v.

OIL, CHEMICAL AND ATOMIC
WORKERS INTERNATIONAL
UNION, AFL–CIO, et al.

Nos. 74–1937 to 74–1939.

United States Court of Appeals,
Third Circuit.

Argued March 21, 1975.

Decided May 12, 1975.

David C. Toomey, Duane, Morris & Heckscher, Philadelphia, Pa., Allan M. Kluger, Richard M. Goldberg, Hourigan, Kluger & Spohrer, Wilkes-Barre, Pa., for appellant.

David E. Koff, David W. Saba, Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., for appellees.

Before ALDISERT, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order of the district court awarding attorney's fees, expenses and costs in favor of the defendant labor unions pursuant to § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107.[1] This dispute had its origin in a complaint filed on February 19, 1974 by appellant Celotex Corporation pursuant to § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) against the Oil, Chemical and Atomic Workers Union, AFL–CIO, Local 8–672, the International with which the local is affiliated, and certain individual members and officers of the union. Celotex sought a temporary restraining order against a work stoppage which it alleged was in violation of a no-strike pledge contained in a collective bargaining agreement then in effect between the company and the union, and also asked for a hearing on an injunction. On that same day, the court issued the TRO enjoining the work stoppage.

On March 12, 1974 the court held a consolidated hearing on plaintiff's motion for the injunction. The court denied Celotex's request for injunctive relief and instead granted the unions' motion to vacate the TRO.[2] It did so on the ground that injunctive relief was no longer necessary because the work stoppage had ceased and that there was little likelihood that the strike would resume.

Thereafter the unions moved for assessment of damages against the company pursuant to § 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107. The unions contended that the TRO had been improvidently granted in that the court failed to follow certain procedural requirements imposed by § 7. The district court, upon its reading of our opinion in United Steel Corp. v. United Mine Workers, 456 F.2d 483 (3d Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972), concluded that the procedural requirements of the Norris-LaGuardia Act are to be strictly complied with in a *Boys Market* injunction situation, and that for the company's failure to do so, damages pursuant to § 7 were appropriate. Following a hearing held on July 15, 1974 to determine the unions' reasonable costs, including attorney's fees, the district court ordered Celotex to pay the unions a total of $2,997.42.[3]

We reverse because the district court, in these circumstances, misapplied § 7 of

---

1. Celotex Corp. v. Oil, Chemical and Atomic Workers International Union, 377 F.Supp. 750 (M.D.Pa.1974).

2. Celotex Corp. v. Oil Chemical and Atomic Workers International Union, 373 F.Supp. 29 (MD.Pa.1974).

3. By order of August 1, 1974 amending an earlier order of July 23, 1974, the district court stayed enforcement and execution of the judgment by the unions against the company pending this appeal.

the Norris-LaGuardia Act, 29 U.S.C. § 107.

Celotex owns and operates a plant manufacturing mineral ceiling tile located in Harding, Pennsylvania. The plant's production and maintenance employees are members of Local 8–672, with which Celotex had a collective bargaining agreement. This agreement contains grievance and arbitration provisions, and an express covenant by the union that during its term "there shall be no strikes, slow-downs, sit-downs, walkouts, or other interference with work." (App. at 21a). On February 15, 1974 an unauthorized wildcat strike took place at the plant halting all production. The unions concede that the strike violated the contract.

## I. CELOTEX'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER

On February 19, 1974 Celotex filed a verified complaint, a motion for a temporary restraining order, an affidavit of Richard H. Enslen, its Plant Manager and a certification of notice to the defendants. The motion, relying on both the verified complaint and the affidavit, asserted that immediate and irreparable injury would occur to Celotex if the conduct complained of was not enjoined prior to notice and hearing. The certification of notice to the defendants indicates that at 9:30 a. m. on February 19th the attorney for Celotex personally notified William Clemens, International Representative of the parent union that Celotex would file the complaint and move for a temporary restraining order in Scranton that morning; that between 9:30 and 10:00 a. m. on February 19th Enslen, the Plant Manager, so notified two officers of Local 8–672, and at 9:40 a. m. Harned, the Plant Superintendent, notified a third union officer.

The verified complaint and affidavit established these facts:

1. *The illegal work stoppage*—On February 15, 1974 Celotex discharged an employee, George Killian, the newly elected president of Local 8–672, for alleged tardiness and absenteeism after numerous warnings. Local 8–672 submitted a grievance over the discharge and Celotex agreed to arbitrate. The employees represented by the local, however, refused to report to work and set up a picket line. As a result of the work stoppage and picket line all production in the plant, all deliveries of supplies, and all shipments ceased. Celotex directed the employees to return, and sought assistance from the officials of both the local and parent unions. At a meeting on February 18th the company was advised by several such officials that the employees would not return to work unless Killian was reinstated. The company advised that it would promptly arbitrate Killian's case but would not reinstate him pending arbitration. Clemens, a union official advised the Celotex Plant Manager that the men would return to work if the company would agree not to discipline anyone who participated in the strike. The Plant Manager could not so agree since the strike was in breach of the contract. After a committee of union officials met with the employees Clemens advised that he did not think the employees would return to work.

2. *Physical risk to the plant*—Celotex depended for its heat and the operation of the plant on almost daily deliveries of fuel oil which the pickets blocked from entering the plant by standing stationary in front of the trucks. It was necessary to keep the plant heated both to permit supervisory personnel to work and to prevent the plant's water lines from freezing and bursting. The plant contains an extensive sprinkler system which is its primary fire protection. If it ran out of fuel and the pipes froze the system would be destroyed. If the water pipes were bled to prevent freezing and rupture there would be no fire protection for the plant.

On the evening of February 15th the plant foreman on duty advised the plant manager by telephone that State Police and Exeter Police were at the plant to investigate a report that a bomb had

been put in the plant. They searched and found nothing.

3. *Economic losses*—The Celotex plant produces mineral ceiling tile with a value of $20,000 to $25,000 a day. This production is sold to the construction industry, which works on job deadlines. On February 15th the plant had ready for shipment almost two million square feet of production with a value of $340,000. The construction industry customers for whom these shipments were destined would, if their orders were not filled within their deadlines, obtain similar products from competitive sources. This would result in a permanent loss of those sales and might result in loss of customers with whom Celotex had a continuing business relationship.

Although notified that Celotex intended to apply for a temporary restraining order early in the morning on February 19th, the unions did not appear at the hearing held at 5:00 p. m. that afternoon. The attorney for Celotex was prepared to offer live testimony, but since the allegations of the verified complaint and affidavit were not put in issue the court proceeded to issue an order on the basis of those pleadings. The order sets forth these findings:

"The Plaintiff in this action, the Celotex Corporation, appeared before this Court on February , 1974, and presented to the Court a verified complaint, a Motion for a Temporary Injunction, affidavits and exhibits. Upon due examination of this Matter, the court finds that unless a Temporary Restraining Order is issued, Plaintiff will suffer grave, immediate and irreparable injury in that it will lose sales on the average of $20,000–$25,000 per day; that it will be unable to keep the plant heated, which will cause its pipes to burst, including those of its sprinkler system, resulting in the destruction of equipment and exposing its Pittston Plant to the danger of fire; and that it will be required to close its Pittston Plant within three days.

The Court further finds that reasonable efforts have been made to notify the defendants and that the damages set forth above could well be incurred before they all be notified and served, and a hearing held." (App. at 38a).

The order restrained the unlawful strike, required the filing of a bond, fixed March 1, 1974 at Williamsport as the time and place of a hearing on an injunction, and provided that the restraint would expire on that date.

## II. PROCEEDINGS SUBSEQUENT TO THE TEMPORARY RESTRAINING ORDER

Celotex secured the temporary restraining order against the work stoppage at 5:17 p. m. on February 19th. At the same time that Celotex appeared before the court, the union and its members held a meeting to consider ending the strike. At 6:00 p. m., without knowledge of the outcome of the court's action, the rank and file voted to return to work and began reporting to the plant that evening.

Between February 19th and March 1st, no motion was made to vacate or modify the order. On March 4, 1974 an order was entered continuing the injunction hearing from March 1st to the first available civil trial date at the March 1974, Williamsport session, with a pretrial conference to be held on the morning of the hearing. The March 4, 1974 order provided that "the temporary restraining order entered February 19, 1974 shall be continued in full force and effect to the date when the hearing is had in accordance with this order." (App. at 41a–42a). The recitals in the March 4th order suggest that it was entered by the court as a result of a stipulation by counsel. (App. at 41a). On March 8th the defendants filed a motion to vacate the temporary restraining order, but this motion was not acted upon separately since the matter came on for a final evidentiary hearing on March 12, 1974. (App. at 43a–44a). The district court on March 19, 1974 filed an opinion

in which it found that the dispute was arbitrable, that the work stoppage was illegal and would ordinarily be the proper subject of injunctive relief, but that because the employees had returned to work the case was moot.[4] Celotex did not appeal from that decision. Thus the propriety of the ruling on mootness is not before us. Since the case was moot the court granted the defendants' motion to vacate the temporary restraining order and dismissed the action.[5]

On May 6, 1974 the defendants filed a post-judgment motion for assessment of damages. (App. at 184a–85a). They referred to the bond which had been filed at the time the temporary restraining order had been issued, relied on §§ 7–9 of the procedural provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 107–09, and alleged:

> "The Defendants have suffered loss and expense caused by the erroneous issuance of the Temporary Restraining Order in this matter, and Plaintiffs have incurred expenses and suffered loss for their defense against Plaintiff's subsequent Motion for Preliminary and Final Injunctive relief, which was subsequently denied by this court. Said damages are in the amount of $4,900.00." (App. at 185a).

At a hearing on this motion the attorney for the defendant unions testified that he was retained on February 27, 1974. (App. at 191a–92a). On that date he reviewed the pleadings and the contract, and conferred with the attorney for Celotex with respect to a stipulation for a continuance. Undoubtedly this arrangement for a stipulation is what prompted the court's order of March 4, 1974 continuing the case from March 1st. The defendants' attorney next had contact with the file on March 2, 1974. (App. at 193a). The court granted the motion,[6] and in a separate hearing held on July 15, 1974 assessed witness fees and expenses, $197.00; counsel fees, $2750.00; and expenses incident to counsel's services $50.42 for a total of $2,997.42 in damages. (App. at 205a).

The sole basis for the court's ruling was the alleged procedural defects with respect to the issuance of the temporary restraining order on February 19, 1974. It is not suggested that there were any procedural defects concerning the hearing on Celotex's motion for a preliminary and permanent injunction on March 12, 1974. All of the expenses which were incurred by the defendant unions and assessed by the court would have been contracted by them in any event had Celotex proceeded with its motion for an injunction without first applying for a temporary restraining order.

## III. THE GOVERNING LAW

In United States Steel Corp. v. United Mine Workers, *supra*, we held that the procedural provisions of § 7 of the Norris-LaGuardia Act remain applicable in a suit for an injunction pursuant to § 301 of the Labor Management Relations Act so far as consistent with the policies of § 301 as interpreted in the dissenting opinion in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), and the opinion of the Court in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). We reasoned that there was no inconsistency between § 301 and the provisions of § 7 which prohibit the issuance of an injunction except after hearing the testimony of witnesses in open court, after due and personal notice, and after the posting of an injunction bond. Recently the Second Circuit adopted the same accommodation between § 301 and § 7. Hoh v. Pepsico, Inc., 491 F.2d 556, 560 (2d Cir. 1974). *But cf.* Associated General Contractors

---

4. Celotex Corp. v. Oil, Chemical and Atomic Workers International Union, 373 F.Supp. 29 (M.D.Pa.1974). *Compare*, Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

5. 373 F.Supp. at 32; App. at 183a.

6. Celotex Corp. v. Oil, Chemical and Atomic Workers International Union, 377 F.Supp. 750, 754 (M.D.Pa.1974).

v. Illinois Conference of Teamsters, 486 F.2d 972, 975 n. 7 (7th Cir. 1973).

In this case we consider not the provisions of § 7 dealing with injunctions, since none issued, but the provisions dealing with temporary restraining orders which appear as a proviso to the injunction provisions:

> "*Provided, however*, That if a complainant shall also allege that, unless a temporary restraining order shall be issued without notice, *a substantial and irreparable injury to complainant's property will be unavoidable*, such a temporary restraining order may be issued *upon testimony* under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. Such a temporary restraining order shall be *effective for no longer than five days* and shall become void at the expiration of said five days. . . ." (emphasis supplied except first two words) 29 U.S.C. § 107(e).

## IV. THE ALLEGED DEFICIENCIES

The unions urge and the district court found that there were several technical deficiencies in the proceedings leading to the issuance of the temporary restraining order and in the order itself.

■ First, it is urged that the notice of the application did not comply with § 7. 377 F.Supp. at 752–53. But that notice requirement refers to the hearing on an injunction, either preliminary or permanent, and the part of § 7 quoted above makes clear that a temporary restraining order may in appropriate cases be issued without notice. The first sentence of Rule 65(b), Fed.R.Civ.P. imposes an additional requirement, not found in § 7. That rule requires the applicant's attorney certify to the court in writing the efforts, if any, which have been made to give notice and the reasons supporting his claim that notice should not be required. There was substantial compliance with Rule 65(b) in this respect.[7] The district court's conclusion that per-

sonal notice is required by § 7 before a temporary restraining order may issue simply misreads the proviso quoted above. Celotex urges that in any event the notice did comply with § 7. Since, however, notice could have been dispensed with, we need not decide for the purposes of this decision, whether the notice given would have been adequate for a temporary injunction rather than a temporary restraining order.

■ Next it is urged that the complaint did not sufficiently allege such "substantial and irreparable injury to complainant's property" as would justify issuing a temporary restraining order pursuant to § 7. The district court held that the verified allegations with respect to the water pipes freezing, or the risk of fire if they were drained, were insufficient. 377 F.Supp. at 753. This holding plainly is error in the Middle District of Pennsylvania during the winter month of February.

■ Next it is urged that § 7 requires live testimony of witnesses in open court before a temporary restraining order may issue, 377 F.Supp. at 753. The statute does so provide, and must be contrasted with the language of Rule 65(b) which permits reliance upon affidavits or a verified complaint. Here is an instance where accommodation between § 301 and § 7, rather than rigid application of the latter, is appropriate. Obviously some matters, such as the existence of the contractual relationship relied upon, are not particularly suitable for oral testimony, and the district court should be permitted to rely on an affidavit or verified complaint identifying the document. In some instances the no-strike obligation may be so broad or the grievance-arbitration undertaking so all encompassing that there cannot really be any dispute that a work stoppage violates the collective bargaining agreement. Obviously, live testimony will not significantly enlighten on such an issue. On the question of irreparable harm, however, it is quite possible that a veri-

7. Certification of Notice to Defendants, App. at 34a–35a.

fied complaint or an affidavit may paint a picture of potential harm more exaggerated than would appear from live testimony before the court. Moreover, there may be cases where the arbitrability of the underlying dispute is doubtful. In circumstances such as these the preferred course, even in a § 301 case, is for the district court to insist upon some live testimony before it decides to grant a temporary restraining order. Thus we agree with the district court that it would have been more appropriate to have heard live testimony before issuing the February 19, 1974 order. But for reasons to which we refer hereafter, it does not follow that this omission entitles the defendants to recover on the Celotex bond.

■ Finally, it is urged, and the district court held, that the order was issued without filing the findings of fact required by § 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109. 377 F.Supp. at 753. We have quoted above the specific findings as to irreparable injury. These were sufficient for compliance with § 9. The district court also points to the *Boys Markets* requirement that before a strike is enjoined the court find that the underlying dispute is one which both parties are contractually bound to arbitrate. 377 F.Supp. at 753–54. While the February 19, 1974 order did not contain a specific finding to that effect, the pleadings on which the court acted however make clear that this was the fact. Moreover, the arbitrability of the dispute in this case has been conceded by the defendant unions at every stage. To suggest that they should recover on the injunction bond in this case for that omission is to elevate form over substance to an intolerable degree. The Norris-LaGuardia Act was intended to protect real, not phantom interests. The omission of an express finding as to arbitrability before granting a temporary restraining order was in this case completely harmless.

■ There is another deficiency on which neither the district court nor the defendants relied, but which we note *sua sponte*. Section 7 of the Norris-LaGuardia Act permits an *ex parte* temporary restraining order for five days only. Rule 65(b) permits such an order for not to exceed ten days, unless for good cause shown the order is within the initial period extended, or unless the party against whom it is directed consents. Here the initial temporary restraining order of February 19th ran until March 1, 1974. This was in compliance with Rule 65(b), but not in compliance with § 7. There is no reason why, in a § 301 case, the five-day limitation on *ex parte* restraining orders should not apply rather than the longer period permitted by Rule 65(b). However, the defendant unions did not even retain an attorney until February 27th, and the attorney promptly stipulated to a continuance of the order. The error of issuing a ten-day rather than a five-day order caused the defendants no harm or expense, and cannot afford a ground for recovery on the bond.

■ Thus, of the claimed deficiencies in the proceedings leading to the issuance of the temporary restraining order upon which the district court relied, only one, the failure to take oral testimony, is of any substance. But that deficiency cannot be relied upon as a basis for a recovery on the injunction bond because that deficiency caused the union neither harm nor expense.

The district court reasoned that because the temporary restraining order was procedurally deficient the unions could recover for opposing the injunction. 377 F.Supp. at 754. This is a *non sequitur*. Had the temporary restraining order never been issued, and had Celotex proceeded by notice of motion, the expense to the unions would have been identical. If the unions had moved before the district court in the ten-day period during which the temporary restraining order was in effect, for an order to vacate, and if they had succeeded, they probably would have been entitled to recover on the bond. But instead, on February 27th they stipulated to a continuance. (App. at 192a). Obviously

this decision reflected in part the undisputed illegality of the work stoppage. 377 F.Supp. at 751. The attorneys for the unions did, it is true, file a motion on March 8th to vacate the temporary restraining order. (App. at 43a–44a). But the hearing on that motion was combined with the March 12th hearing on Celotex's motion for a permanent injunction, a hearing which was addressed to mootness. By March 8th the only order which was extant was that of March 4th, which in turn was the result of the stipulation for a continuance. It cannot be urged that this latter order violated the procedural requirements of § 7. Moreover, the record is barren of any proof that the February 19, 1974 order granting the temporary restraining order caused the unions any expense in and of itself since they chose not to appear at the hearing. Because the only application made by the unions, and considered by the district court, was for the recovery of loss and expenses incurred subsequent to that order, as well as for the reasons stated earlier, we find the award erroneous.

The judgment of the district court will be reversed.