JACKSONVILLE MARITIME ASSOCIATION, INC., etc., et al.,
Plaintiffs-Appellees,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, etc., et al.,
Defendants-Appellants.

No. 77–1029.

United States Court of Appeals,
Fifth Circuit.

April 17, 1978.

Lacy Mahon, Jr., Joseph S. Farley, Jr., Jacksonville, Fla., for defendants-appellants.

Gary A. Bubb, Jacksonville, Fla., for plaintiffs-appellees.

Before JONES, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

This case concerns the propriety of a preliminary injunction against a labor stoppage. More generally, it concerns the limits of the national policy prohibiting labor injunctions, and of the narrow exception to that prohibition, through which some labor injunctions are permitted in order to enforce peaceful arbitration procedures agreed upon by the parties.

The plaintiff, Jacksonville Maritime Association (JMA), is a multi-employer bargaining association that bargains with unions on behalf of its members in the Jacksonville, Florida, maritime industry. One of these unions is the defendant, · International Longshoremen's Association Local 1408–A (ILA). The present case stems from certain difficulties between the ILA local and two employer members of the JMA. On October 19, 1976, one of these employers, Jacksonville Port Authority (JPA), requested from the ILA hiring hall that two men, a "header" (union contact man) and a forklift operator, be sent to one of its warehouses the following day. The next day three men arrived, the two ordered plus a warehouse laborer; by direction of the ILA local president, each refused to work unless all three were employed. The JPA would not permit them to work under these circumstances, and they left. This scenario was repeated the following two days.

Meanwhile, another JMA employer, Eller & Company, apparently ordered six men and was sent eight. All eight were put to work, but two of the forklift operators refused to do warehouse work that they had done in the past; and indeed it soon appeared that, by instructions of the ILA local president, none of the men would perform any work except that of his specific job title. At this juncture, Eller's manager directed the foreman to pay off the men and let them go. Here too, much the same scene was repeated over the next two days, the ILA men refusing to work except in their specific job categories.

What appears to have been at issue in both sets of incidents was the union's desire to prevent employers from requiring men in certain wage categories to perform work in lower wage categories, even though paid at the higher wage rate. The collective bargaining agreement listed four separate wage categories but said nothing specific either way about individual employees working at tasks assigned lower job classifications. The contract did contain clauses, reprinted in the margin,[1] that reserved to

---

1. 7–A. It is understood and agreed that members of Local No. 1408–A shall be given employment if they are available and they can satisfactorily qualify as to physical fitness and experience. The employer is to designate the number of men to be employed and reserves the right to hire and discharge. That all the men to be hired by the header designated by the employer, [sic] however, the employer re-

serves the right to reject men if they feel that they are not qualified.

\* \* \* \* \* \*

14. Management of the Employer's business and the direction of the work forces in the operation of its business are exclusively vested in the Employer as functions of Management. Except as specifically provided in this Agreement, all of the rights, powers and authority

employers the rights to designate the number of laborers employed and to direct the work force; it also prohibited lockouts, strikes, or work suspensions and provided for arbitration of grievances.

On the third day of these incidents, the JMA secured a temporary restraining order from the United States District Court for the Middle 'District of Florida prohibiting the ILA local from overfilling labor orders, from directing workers to disobey work assignments, or from engaging in any other work stoppages. Upon the expiration of the temporary restraining order, the district court granted a preliminary injunction to the same effect and ordered both parties to arbitrate their grievances. The union appeals.

The grant of a preliminary injunction rests in the discretion of the district court, and we review solely for abuse of that discretion. *See, e. g., State of Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974); *DiGiorgio v. Causey,* 488 F.2d 527, 528 (5th Cir. 1973); *Johnson v. Radford,* 449 F.2d 115, 116 (5th Cir. 1971). Nevertheless, a preliminary injunction remains an extraordinary remedy, and the district court may exercise its discretion only within certain well-established guidelines. In every case the court must conclude that the movant has met four prerequisites for this drastic remedy. These are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing

Employer had prior to signing this Agreement are retained by Employer.

15. During the term of this Agreement the Employer agrees that there shall be no lockouts of the members of the Union, and the Union agrees that there shall not be any strike of any kind or degree whatsoever, walkout, suspension of work, curtailment or limitation of production, slowdown, or any other interference or stoppage, total or partial, of the Employer's operation for any cause whatsoever; such causes including but not limited to unfair labor practices by the Employer or violation of this Agreement. The right of employees not to cross a bona fide picket line is recognized by the Employer. The Union shall not be financially responsible for strikes or walk-out [sic] not authorized or assented to by the Union.

16. Matters under dispute which cannot be promptly settled between the Local and an individual Employer shall, not later than forty-eight hours after such discussions, be referred in writing covering the entire grievance to a Port Grievance Committee composed of one member from a company not involved in the dispute, the Port Employer member of the Joint Negotiating Committee, the Port Union Member of the Joint Negotiating Committee, and a Union member not involved in the previous attempts to settle the dispute. In the event this Port Grievance Committee cannot reach agreement within five (5) days after receipt of the complaint, the written record of the dispute shall be referred to the Joint Negotiating Committee which will function as a District Grievance Committee on the following basis:

There must be present at the Grievance Committee meeting at least three regular Employer members and three regular Union members, in addition to the members from the Port originating the dispute as these latter members may participate in the discussion but may not vote. Each side shall have four votes, and if the fifth member of either side is absent he shall authorize his vote to be cast by one of the voting members in attendance. This Grievance Committee shall meet at least quarterly, and in the case of urgent matters it shall make every effort to meet as soon as possible.

A majority decision of this Committee shall be final and binding on both parties and on all Employers signing this Agreement. In the event the Committee is unable to reach a majority decision within seventy-two (72) hours after meeting to discuss the case, it shall employ a professional arbitrator whose expenses and fees as well as those of any expert witnesses required by the arbitrator are to be borne jointly by the management and Union of the Port concerned. Should the Committee be unable to agree on the selection of an arbitrator, they shall request the assistance of the Federal Mediation and Conciliation Service in designating a suitable arbitrator. Expenses of the Employer members of the District Grievance Committee are to be borne by the Port Employers, and of the Union members of the District Grievance Committee by the I.L.A.

Any decisions in favor of an Employee involving monetary aspects or discharge shall require the Employer involved to make financial restitution from the time of the complaint concerned, whereas decisions involving working methods or interpretations shall take effect seventy-two (72) hours after being rendered.

party; and (4) a showing that the injunction, if it is issued, would not be adverse to the public interest. *See Seatrain, supra* at 179, and cases cited therein.

A labor injunction raises questions of special delicacy and places still further limitations on the court's discretion. The Norris-La Guardia Act, 29 U.S.C. § 104, largely removes the jurisdiction of federal courts to issue injunctions against labor stoppages, whereas section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides legal remedies to the parties for breach of collective bargaining agreements, including no-strike provisions. In *Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court accommodated these two statutory provisions in the light of the national policy favoring peaceful arbitration of labor disputes. *See* the *Steelworkers Trilogy, United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *see also Gateway Coal v. United Mine Workers of America*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The Court held that federal courts may issue injunctions against labor stoppages in those instances in which the violation of the no-strike clause occurs over an issue that the parties have agreed to arbitrate. In *Amstar Corp. v. Amalgamated Meat Cutters*, 468 F.2d 1372 (5th Cir. 1972), cited with approval in *Buffalo Forge Co. v. United Steelworkers of America, AFL–CIO*, 428 U.S. 397, 96 S.Ct. 3141, 3145, 49 L.Ed.2d 1022 (1976), this court ruled that the *Boys Markets* case established three prerequisites for a federal district court's jurisdiction to enjoin a strike: (1) the strike must be in breach of a no-strike obligation under an effective collective bargaining agreement; (2) the strike must be over an arbitrable grievance; and (3) both parties must be contractually bound to arbitrate the underlying grievance caused by the strike.

Thus, before exercising its discretion to issue a preliminary injunction against a labor stoppage, the district court must first find that the movant's case meets a total of seven criteria: four derived from the traditional equitable requirements governing all preliminary injunctions, and three derived from the *Boys Markets* ruling specifically concerning labor injunctions. The district court considered all seven of these criteria, and the appellant contests its findings only with respect to three. Two of these contested findings are *Boys Markets/Amstar* issues: the finding that there was a breach of the no-strike provision of the contract and the finding that the strike was over an arbitrable issue. The third concerns a traditional equitable prerequisite: the finding of irreparable injury. We consider these objections in order.

1. *Breach of the contractual no-strike provision.* The collective bargaining contract between the parties contains no definition of a forbidden strike or work stoppage. In the absence of such a contractual definition, the district court turned to the definition of "strike" contained in the National Labor Relations Act, 29 U.S.C. § 142(2):

> The term "strike" includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees.

On the basis of this definition, the district court concluded that the union members' refusal to work under direction constituted a strike in violation of the contractual no-strike clause. We cannot say that this conclusion, or the method by which the district court arrived at it, was erroneous. Certainly federal law permeates the relationships between the parties, and in the absence of specific contractual provisions the federal statutory definition is strong evidence of the understanding of the parties about the meaning of "strike." We note that the

district court's conclusion is by no means the definitive answer to the question of violation of the contractual no-strike provision; the court's conclusion on this point speaks only to the jurisdictional prerequisite under *Boys Markets*. The final decision as to whether there was a "strike" in violation of the contract is a matter for arbitration, since according to the contract itself the arbitrators have final authority to settle contractual grievances.

■ 2. *Arbitrable dispute.* Neither party contends that the subject of the dispute was anything but an arbitrable issue, since the dispute clearly concerned a question arising under the contract, that is, whether employees could be directed to perform work below their job classifications. The district court concluded—and neither party contests the conclusion—that the subject matter of the underlying dispute was an arbitrable issue. But the ILA local continues with a somewhat subtler argument: not only must the subject matter of the dispute be arbitrable, it says, but the employer must have alleged and proved its willingness to arbitrate the issue. We note that a very similar question was left unsettled in the recent *Buffalo Forge* case, 96 S.Ct. at 3144 n.3; also 3148. In the absence of direction from the Supreme Court, we decline to import this procedural nicety into the requirements for an injunction under *Boys Markets*.

We arrive at this conclusion for several reasons. In the first place, the literal language of *Boys Markets* speaks against the argument. In *Boys Markets* the Court, quoting with approval from the dissent in *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), said that the employer should be ordered to arbitrate as a condition for the grant of an anti-strike injunction. *Boys Markets, supra,* at 255, 90 S.Ct. 1583. It is difficult to see what would be added by requiring the employer, who presumably knows this condition of an anti-strike injunction, to make an additional showing of his willingness to arbitrate.

Second, such a procedural requirement could run counter to the policy of *Boys Markets* and of the *Steelworkers Trilogy* so central to its reasoning. All these cases stress that arbitration is a quid pro quo for the employees' contractual relinquishment of the right to strike; it is to make certain that the union members exhaust the arbitration process—rather than striking from the outset—that *Boys Markets* permits limited anti-strike injunctions where the work stoppage is avoidable through invocation of the arbitration process. Where arbitration would do nothing to prevent a work stoppage—as in *Buffalo Forge,* where the underlying grievance did not concern an arbitrable issue—*Boys Markets* does not apply, and the work stoppage may not be enjoined under its authority. *Buffalo Forge, supra.* But where the underlying issue is arbitrable, as in this case, the district court may arrest a work stoppage and a circumvention of the arbitration process through prompt issuance of an injunction. To require in every case an allegation and proof of willingness to arbitrate is merely to add a new procedural step that could confuse issues and ultimately extend the very conditions—work stoppage and circumvention of arbitration—that *Boys Markets* sought to remedy.

The inappropriateness of a talismanic invocation of such pleading rules is clear from the facts of this case. The parties here quarrelled about which of them was required first to raise the grievance and invoke arbitration. In light of *Buffalo Forge,* this sort of secondary dispute is subject to serious abuse. By refusing to file a grievance, a union can force the employer to file the first grievance. But the employer's grievance is presumably the employees' violation of the no-strike clause, and according to *Buffalo Forge* a *Boys Markets* injunction may not issue where the only issue is such a no-strike violation with no further grievance underlying the strike. Hence this case in itself exemplifies the confusion and evasion of *Boys Markets* that could follow upon introduction of a requirement that the employer in every case prove willingness to arbitrate, particularly if the re-

quirement enables a union to maneuver the employer into filing the initial grievance. Such a requirement, rigidly enforced, would open the door to diversionary tactics and impede the major policy informing *Boys Markets* and its progeny: the prompt and peaceful settlement of labor disputes through invocation of the arbitration process. We need not "elevate form over substance" to permit such a result; the "Norris-La Guardia Act was intended to protect real, not phantom interests." *Celotex Corp. v. OCAW,* 516 F.2d 242, 248 (3rd Cir. 1975).[2]

*Buffalo Forge* raises an additional policy consideration that courts should where possible avoid preliminary decision of matters that will ultimately be decided by the arbitrator, since such preliminary decisions may preempt or perhaps influence decisions that the parties intended to leave to arbitration. 96 S.Ct. at 3149. Violation of a no-strike clause is, of course, a matter for determination on its merits by the arbitrator; and in order to establish jurisdiction in a *Boys Markets* injunction the district court must always make some finding on this issue. But *Buffalo Forge* recognizes this, and it clearly envisions that such preliminary findings, for jurisdictional purposes, will continue where a *Boys Markets* injunction is appropriate. It may be that these preliminary determinations could sometimes be avoided if the party seeking the injunction were required to "exhaust remedies" by proving willingness to arbitrate. But while such proof was being established—presumably a request for arbitration, followed by a wait for the response—the strike could continue, thus undermining the very purpose of

the *Boys Markets* injunction: the prompt prevention of work stoppages that evade arbitration.

For these reasons, we decline to hold that the district court must in every case require a showing of the movant's willingness to arbitrate before issuing a *Boys Markets* anti-strike injunction. To be sure, it may be within the district court's discretion to require such a showing in a particular case; as to that issue we express no view.

■ 3. *Irreparable injury.* Appellants argue that the traditional equitable requirement that irreparable injury be shown has not been met here. They say that the JMA employers could have paid the extra men during the pendency of the dispute; and, should the employers have won on the merits, they could have collected the excess wages in damages. The availability and adequacy of money damages, of course, has always been an important consideration in evaluating irreparable injury. But once the JMA employers lost control over the numbers of men to be hired, they had no way to know how many would be sent at any time, and whether indeed they could afford all those sent, as the union suggests; hence, the possibility of a later recovery of excess wages becomes highly speculative. As the district court's opinion notes, unilateral action by one party was not the benefit for which the parties bargained, and in this case the cost of unilateral action could be highly speculative.

■ The appellants urge further that there was no showing of irreparable injury because, they say, the JMA failed to show

---

2. *Carter v. Herrin Motor Freight Lines, Inc.,* 131 F.2d 557 (5th Cir. 1942), on which the dissent places some weight, addresses the procedural requirements of the Norris La Guardia Act in the absence of any collective bargaining agreement subject to Section 301(a) of the Labor Act. We look rather to *Boys Markets* and succeeding cases that deal directly with the problem at issue in this case: the accommodation of the Norris La Guardia Act to section 301(a) of the Labor Act. Other authorities, cited by the dissent, do not support a rigid application of the supposed procedural requirements of the Norris La Guardia Act where those requirements lend themselves to tactics

that undermine accommodation between the two acts. For example, we quote in full the relevant portion of *Celotex Corp. v. OCAW,* 516 F.2d 242, 246 (3rd Cir. 1975): "In *United States Steel Corp. v. United Mine Workers, supra* [456 F.2d 483 (3d Cir.), cert. denied, 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334], we held that the procedural provisions of § 7 of the Norris-La Guardia Act remain applicable in a suit for an injunction pursuant to § 301 of the Labor Management Relations Act *so far as consistent with the policies of § 301 as interpreted in the dissenting opinion in Sinclair Refining Co. . . . and the opinion of the Court in Boys Markets . . . .*"

delay or cancellation of any specific shipment. The district court's finding of irreparable injury, however, was based on the additional consideration that labor unrest in itself could cause shippers to avoid the Jacksonville port, with the effect of a long-term diversion of business from that port. In *Seatrain, supra,* diversion of this sort was held to constitute irreparable injury sufficient to sustain a preliminary injunction. While this case is not so compelling as was *Seatrain,* where the trade diversion promised to be permanent, there is sufficient evidence in the record to support the district court's finding.

The district court in this case carefully considered both the traditional equitable requirements for a preliminary injunction and the special jurisdictional requirements for a *Boys Markets* injunction of a labor stoppage. We find no abuse of discretion in its action.

AFFIRMED.

GODBOLD, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding that the employer was not required to allege and prove as a prerequisite to a *Boys Markets* [1] injunction that it was willing to arbitrate and had resorted to the contractual arbitration machinery. The Supreme Court pretermitted this issue in *Buffalo Forge Co. v. United Steel Workers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). The majority characterize preinjunction arbitration as a mere "procedural nicety." I consider it to be much more substantial than that, given the narrowness of the *Boys Markets* exception to the Norris-La Guardia Act, 29 U.S.C. § 104, and the strong national policy favoring arbitration as a dispute-resolution mechanism.

The most serious flaw in the majority opinion is that it underestimates the strength of the national labor policy expressed in the Norris-La Guardia Act. The Act's anti-injunction provision so permeates the fabric of labor regulation that it yields only to the strong national policy favoring arbitration. *See Boys Markets, supra.* The majority's decision injures both these interests. By abrogating the anti-injunction Act the majority treat too lightly the protective purpose of the Act, which is to ensure that injunctions issue in only the most extreme cases of labor strife. Then, by refusing to require the employer to seek arbitration prior to receiving an injunction, the majority bypass the recognized preference for arbitration as a voluntary, peaceful means of resolving labor disputes. [2] It seems to me that the implicit premise of the majority opinion is that arbitration is ineffective as a means of settling grievances; otherwise, the majority would not condone the employer's repairing to the courthouse without resort to arbitration. This premise is, of course, contrary to every Supreme Court case to consider arbitration since the *Steelworkers Trilogy.* [3]

Two independent considerations support requiring the employer to resort to arbitration prior to receiving an injunction. The first is the language of 29 U.S.C. § 108, denying jurisdiction to issue injunctions if the employer "has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation *or voluntary arbitration.*" (Emphasis added.) This "clean hands" provision of the Norris-La Guardia Act would seem to deny

---

1. *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

2. Chief Justice Burger recently reiterated the strong preference given arbitration by the judiciary. *See* Remarks of the Chief Justice on the State of the Judiciary, American Bar Association Midyear Meeting (Feb. 12, 1978). *See generally Sibley v. Tandy Corp.,* 543 F.2d 540 (CA5, 1976), *cert. denied,* —— U.S. ——, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977).

3. *See, e. g., United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of American v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *cf. Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).

jurisdiction to issue injunctions in the situation condoned by the majority. Fifth Circuit precedent reads § 108 to cover voluntary private arbitration as well as governmental mediation. In *Carter v. Herrin Motor Freight Lines, Inc.,* 131 F.2d 557 (CA5, 1942), the court consistently treated the three clauses of § 108—negotiation, governmental mediation, and voluntary arbitration—as being written in the disjunctive. *See id.* at 559, 560 & 560 n.5.[4]

Apart from *Carter,* there are substantial reasons for applying the jurisdictional limitation of § 108. The highly preferred status of arbitration lends it a governmental imprimatur. Moreover, equity traditionally requires the person seeking an injunction to demonstrate clean hands. Here, the employer accuses the union of violating the no-strike provision of the contract. But unless the employer lives up to its promise to arbitrate, it, too, has violated the contract.

*Boys Markets* itself supports the result I would reach. That case required that the employer be ordered to arbitrate as a condition of obtaining an injunction. The majority say that this provision "speaks against" the requirement of pre-injunction resort to arbitration. It does not speak with much force else the Supreme Court would hardly have pretermitted the question six years later in *Buffalo Forge.* In truth, *Boys Markets* "speaks for" the result opposite that reached by the majority. The employer there had sought to invoke the contractual procedures for grievance and arbitration, but the union had refused. 398 U.S. at 239, 90 S.Ct. at 26 L.Ed.2d at 204. Thus the employer would appear to have been entitled to an unconditional injunction—it already had brought itself within the § 108 requirements and had shown clean hands. Despite this the Court required arbitration as a condition to the injunction granted to the employer. This decision is hardly authority that an employer who has spurned arbitration should be granted an injunction conditional upon his doing what he agreed to do in the first place but has not done. Rather *Boys Markets* demonstrates the great deference which the Supreme Court gives to arbitration.

Policy considerations also support requiring the employer to invoke preinjunction arbitration rather than merely express willingness to arbitrate. Arbitration may end the strike and obviate the need for an injunction, and prompt institution of arbitration may act as an industrial safety valve to dissipate pressures and hostilities that led to the strike. The *Boys Markets* exception to the Norris-La Guardia Act is very narrow, *see United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236 (CA5, 1975); in abrogating the jurisdictional ban on injunctions, the Supreme Court expressed no intention also to lift the procedural requirements of the Act. Moreover, given the Court's concern in *Boys Markets* with harmonizing the anti-injunction Act and the national policy favoring arbitration, requiring the employer to initiate arbitration guards against hastily issued injunctions and strengthens the favored status of arbitration as a dispute resolution procedure. *See Elevator Mfgr's Assn. v. Int'l Union of Elevator Constr. Local 1,* 331 F.Supp. 165 (S.D.N.Y.1971); *Transamerican Trailer Transp., Inc. v. Seafarer's Int'l Union,* 336 F.Supp. 1052 (D.Puerto Rico 1971); *see generally Emery Air Freight Corp. v. Local Union 295,* 449 F.2d 586 (CA2, 1971), *cert. denied* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Celotex Corp. v. OCAW,* 516 F.2d 242 (CA3, 1975) (procedural requirements of § 7 applicable to *Boys Markets* injunctions).

The employer before us contends that arbitration would not have been as speedy as injunctive relief and that it would have suffered serious injury while arbitration was in process. This ignores that the subject matter is one which the employer contracted to arbitrate and that the employer

---

4. Dicta in *Brotherhood of Railroad Trainmen v. Toledo P. & W. RR.,* 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944), seems to indicate that the phrase encompasses only "governmental machinery . . . of voluntary arbitration." *See Charles D. Bonanno Linen Serv. Inc. v. McCarthy,* 532 F.2d 189 (CA1, 1976).

is asserting the power, at its option, to bypass the machinery which it agreed to use. More importantly, the question of what happens if arbitration takes too long or is delayed by union foot-dragging is an issue to be faced in another case. In this case the employer simply decided for itself that it was not going to use the arbitration route at all and filed its papers in the district court.