UNITED STEELWORKERS OF AMERICA, LOCAL 2609; and United Steelworkers of America, Local 2610

v.

BETHLEHEM STEEL CORPORATION, Sparrows Point, Maryland; and D. W. Kempken, Secretary, Insurance Board Bethlehem Steel Corporation.

Civ. No. K–81–1862.

United States District Court, D. Maryland.

July 27, 1981.

I. Duke Avnet, John H. Price, Jr. and Ronald Schwartz, Baltimore, Md., for plaintiffs.

Earle K. Shawe, Warren M. Davison, Stephen D. Shawe, J. Michael McGuire and Shawe & Rosenthal, Baltimore, Md., for defendants.

1. Jurisdiction exists pursuant to 29 U.S.C. § 185(a). As to procedural requirements, *see*

FRANK A. KAUFMAN, Chief Judge.

This suit was instituted on July 23, 1981. Herein plaintiffs (Union) seek injunctive relief, including a temporary restraining order, against certain proposed actions relating to health insurance coverage provided by defendants (Company) to employees of the Company who are members of the Union.[1] On July 20, 1981, grievances were filed by both of plaintiffs (two locals of the Union) on behalf of individual members, challenging such actions as violative of those members' rights to privacy and of certain specified provisions of the existing collective bargaining agreement between the Company and the Union (collective bargaining agreement). The grievants who commenced those grievances seek therein immediate resolution of their grievances—if required, by prompt arbitration—and the maintenance of the status quo pending the completion of such grievance-arbitration. The Company is willing to proceed promptly to arbitration but not entirely so to maintain the status quo. Because of that latter unwillingness, the Union asks this Court to order maintenance of the status quo pending arbitration and also to grant certain further relief as may be appropriate. The within dispute involves approximately 13,-000 employees at the Company's plant at Sparrows Point, Maryland who are members of the two plaintiff-locals of the Union.

On Friday, July 24, 1981, and Monday, July 27, 1981, nonevidentiary hearings were held by this Court in connection with plaintiffs' motion for a temporary restraining order and preliminary injunction and defendants' memorandum in opposition thereto. The parties agree that most of the material and relevant facts are not in dispute. There are certain facts, however, which are relevant and material in connection with which the parties are not in agreement. However, the parties have stated that they do not desire to take any evidence at this time in this case, it being the position of the Union that the latter is

Federal Civil Rule 65.

entitled to equitable relief in excess of that set forth *supra* and it being the position of the Company that the Union is not entitled to any relief whatsoever at this time. However, despite the Company's position in that latter regard, it has stated that it will abide by the provisions of this opinion. Under the circumstances, there would appear no need for this Court to take any evidence in this case at this time.[2]

In essence, what is involved in this case is that the Company desires to require its employees who are members of the Union to furnish certain information relative to the Company's desire (a) to determine whether certain "dependents" who have been so designated by employees of the Company, and who have been carried as covered persons under the Company's program of insurance benefits for hourly paid union employees are or are not dependents and (b) if they are not dependents, to notify such employees that coverage will cease with regard to such persons. In that connection, the provisions of section 8.1 of "Program of Insurance Benefits for Hourly Paid Employees of Bethlehem Steel Corporation and Subsidiary Companies Pursuant to Agreement with United Steelworkers of America, as Amended Effective January 1, 1981," are applicable.[3] The Company has recently issued guidelines and instructions pursuant to which it proposes to require its union employees to re-enroll in the said health insurance plan and in so doing to furnish certain written information which the Company states is needed in order for determinations to be made as to whether certain given persons are or are not dependents. In that connection, the Company seeks information, if the same is needed in a given instance, concerning the identity of the natural father and the natural mother of certain children and/or information of a similarly sensitive and private type. The Company has stated that it will not seek any such information in any given instance unless it is necessary to enable determination of whether a child is a "blood descendant of the first degree" of an employee[4] or whether the employee is "related to the child by blood or marriage," or in order to determine whether the child is "being supported solely by" the employee,[5] or in order to ascertain facts needed with regard to the application of some other provisions of the Program[6].

---

**2.** *See* 29 U.S.C. § 107. *See also United States Steel Corp. v. United Mine Workers of America*, 456 F.2d 483, 487–88 (3d Cir. 1972).

**3.** Said section 8.1 reads as follows:
The term "dependents" includes only:
(a) Your spouse.
(b) Your unmarried children under 19 years of age. Such children include (1) a blood descendant of the first degree, (2) a legally adopted child (including a child living with the adopting parents during the period of probation), (3) a stepchild residing in your household, or (4) a child permanently residing in the household of which you are the head and actually being supported solely by you, provided you are related to the child by blood or marriage or are the child's legal guardian.
(c) Children after attainment of age 19 but not beyond attainment of age 25, if, in addition to otherwise meeting the definition of dependent children as contained in (b), such dependent is: a full-time student in a recognized course of study or training, not employed on a regular full-time basis, and not otherwise covered under any other employer group insurance or prepayment plan. Also, to be eligible for coverage as a dependent under this provision, the child must have been eligible for coverage as a dependent prior to attainment of age 19. (See paragraphs 9.36–9.39.)
(d) Children after attainment of age 19 while incapable of self-support because of a disabling illness or injury that commenced prior to age 19 provided such child was eligible for coverage as a dependent prior to attainment of age 19. Such children must otherwise meet the definition of dependent children as contained in (b) and must be principally supported by you. (See paragraphs 9.40 and 9.41.)

**4.** *See* n.3, section 8.1(b)(1).

**5.** *See* n.3, section 8.1(b)(4).

**6.** With respect to the Company's right so to require re-enrollment, section 8.2 of the said Program provides:
To be eligible for dependent coverage, proof may be required that the dependent meets the requirements stated above; special certification will be required to qualify dependents under paragraph 9.1(c) and (d).
Assuming, *arguendo* that the Company has a right to require such re-enrollment, there may

The Union takes the position that certain provisions of the guidelines and instructions which have recently been issued by the Company violate the existing collective bargaining agreement. The Company asserts that the Company has the right under the existing collective bargaining agreement to make such changes but if the Company does not have the right so to do, the matter is in any event one which should be determined within the grievance and arbitration procedures established by the collective bargaining agreement and that there is no basis for the grant by this Court of any of the relief sought herein by the Union. The Union counters by asserting that under the principles of governing law, the Union is entitled to temporary injunctive relief, because the record establishes (1) that the position taken herein by the Union would not be a futile one in arbitration and (2) the Union's members will be subjected to irreparable damage and harm if the injunctive relief sought herein is not granted because even if the Union subsequently achieves success, in whole or in part, in the arbitration process, the relief obtained by that process will not return the parties (and, specifically, the Union's members) to the status quo.

■ The controlling principles of law applicable in this case at this time are found in *Columbia Local, American Postal Workers Union v. Bolger*, 621 F.2d 615, 617 (4th Cir. 1980), in which Judge Phillips, discussing the holdings and the doctrines of *Boys Markets, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1975), and *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), held that whether preliminary injunctive relief should be granted should not be determined under a "'balance of hardship' equitable analysis" but rather under the test of whether "intrusion by injunction is necessary to protect the arbitral process itself." *See also Drivers, Chauffeurs, etc. v. Akers Motor Lines*, 582 F.2d 1336 (4th Cir. 1978);

*Lever Brothers Co. v. International Chemical Workers Union*, 554 F.2d 115 (4th Cir. 1976). In *United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273 (3d Cir. 1979), the Third Circuit held that preliminary injunctive relief was needed in order to prevent the Company from making certain changes in the health insurance coverage which the Company provided for its employees under a collective bargaining agreement. In *Fort Pitt*, the collective bargaining agreement provided that—

> * * * in the event of a labor dispute at the end of termination of this Agreement, *the Company will continue hospitalization and insurance benefits.* At the end of said dispute, *the Company will be reimbursed for payments made on behalf of the employees in payment methods mutually agreed on by the parties.*

*Id.* at 1276 (emphases in original). Judge Hunter concluded (at 1279) that the underlying dispute was subject to mandatory arbitration under the collective bargaining agreement and that the Company's threat to cease making health insurance premium payments during a work stoppage after the agreement's termination constituted an interference with and a possible frustration of the arbitral process. *Id.* at 1279. As to the element of irreparable injury, Judge Hunter wrote (at 1280):

> Finally, we believe that the district court properly exercised its discretion in finding that an injunction was appropriate under equitable principles. The critical issue facing the district court was whether breaches of the contractual agreement to arbitrate caused or threatened to cause irreparable injury to Union members. *See Boys Markets*, 398 U.S. at 254, 90 S.Ct. 1583 [at 1594]. The Company contended that since only the payment of money was involved, there was—apparently as a matter of law—no risk of irreparable harm. The district court ruled, however, that if injunctive "relief

be differences between the Company and the Union, and there may exist arbitrable issues, concerning what procedures are applicable in connection therewith and what rights, if any,

an employee who refuses to submit certain information sought by the Company may possess.

is denied, the hospital and insurance benefits of the union members will lapse." 452 F.Supp. at 890. Fort Pitt now argues that the district court abused its discretion because even after premium payments stopped, benefits would continue for 30 days, at which time the union members would have the opportunity to convert to individual policies.

Initially, we agree with the district court that the fact that the payment of monies is involved does not automatically preclude a finding of irreparable injury. If the risk of "water pipes freezing" can constitute irreparable injury, *see Celotex Corp. v. Oil Workers*, 516 F.2d 242, 247 (3d Cir. 1975), then surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute "substantial and irreparable injury." *Id.* Moreover, the risk of irreparable injury was not appreciably lessened merely because the employees allegedly would remain covered for 30 days after premium payments were terminated and because the employees thereafter would have the option to convert to individual policies. There was no assurance at the time the injunction was issued that the strike would end within 30 days; thus there was a significant risk that absent an injunction, the employees would be without insurance coverage. In addition, the likelihood that all of the employees could have exercised their right to obtain individual policies was problematic, because while the employees were on strike, they were not collecting their wages. * * *

At the outset, in this case, it is necessary to recognize that the Union seeks to avoid what in essence are two types of harm. In the first place, the Union contends that the very furnishing of information sought from individual employees by the Company violates the rights of privacy of those employees under the Constitution of the United States, under one or more federal statutes, and under the collective bargaining agreement. In the second place, the Union asserts that once information is furnished by the employees, such employees will be subject to the possibility of having insurance coverage forthwith terminated as to individual dependents, in violation of the collective bargaining agreement, before the arbitral process can be concluded.

■ The privacy prong of the Union's argument is not based upon any present or contemplated action or lack of action by any federal, state or other governmental officer or body. In this case, only private action which the Company contemplates taking is involved. In some instances, private action may constitute a violation of constitutional rights. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, this would not appear to be such a case. This is also not a case in which the Company is seeking to use the process of any court to compel or to prevent any action. *See Shelley v. Kramer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The Union alleges that the policies embodied in the Company's recently issued instructions and guidelines will have a discriminatory impact upon blacks if the information the Company gathers is *used* to eliminate coverage for certain dependents. Accordingly, it may be that under some circumstances, the Union's members may have a claim in the future in connection with such possible use for violation of certain of their constitutional rights, or of their statutory rights under 42 U.S.C. § 1981 or under 42 U.S.C. § 2000e, *et seq.* (Title VII).[7]

■ The Company stated during the July 24, 1981 and July 27, 1981 proceedings that if any employee refused to give any information sought by the Company, the Company agrees that the Company will not terminate the insurance coverage now carried at the Company's expense under the collective bargaining agreement, without giving 30 days' advance written notice to the employ-

---

7. If Title VII violations are involved, exhaustion of administrative remedies is required before resort to this Court, and no such exhaustion has taken place at this time.

ee. The Company will, in a separate Order of even date herewith, be required to abide by that undertaking, although in so ordering, this Court is confident that both Company and Union would, without any order, fulfill all obligations which they have undertaken during the hearings in this case. Accordingly, if any employee, after receiving such notice, desires the Union to apply to this Court for relief based upon the specific facts pertaining to coverage which the Union asserts such employee is entitled to have and which the Company has notified such employee it is terminating at the end of said 30-day period, such employee can seek to obtain relief in this Court at such time.

In addition, the Company stated during the said two hearings that pursuant to the provisions of the Program and its insurance coverage, if an employee provides information to the Company, and/or the Company itself has available to it other information, any or all of which, in the Company's opinion, entitles the Company to conclude that a given person is not a dependent and that coverage with regard to such person should therefore not continue, the employee has 30 days from the date the employee receives written notice of the cessation of such coverage at the Company's expense under the collective bargaining agreement to notify the Company and/or its insurance carrier that the employee desires, effective as of the date of such written notice, to purchase and have in existence at the sole cost of the employee outside coverage pursuant to the collective bargaining agreement, and if the employee so does, such individual coverage is available to the employee.

The parties have stated that the insurance coverage provided under the collective bargaining agreement is carried with and provided by Blue Cross-Blue Shield of Maryland. The Union has stated that the cost to an employee of maintaining individual coverage of a person the employee maintains is a dependent and the Company states is not a dependent is approximately $200 per month.[7A] The Company asserts that the cost is far less. However, even assuming the correctness of the Union's said statement, any such employee who may receive a notice of termination of coverage can, within a 30-day period, at a cost of $200 per month, continue in force and effect coverage for a dependent who would no longer, after the date of such written notice, be deemed a dependent under the insurance coverage called for by collective bargaining agreement. While the cost of such coverage is certainly not slight, the burden of such cost would not appear to constitute irreparable damage to such employee. That is because the Company and the Union have both agreed during the said two days of hearings that they will cooperate to seek the fastest possible operation of the grievance-arbitration procedure [7B] and in any event will do everything each and both of them can do in order to cause the arbitration of any issue presented by an employee whose coverage is so terminated to take place and to be completed within sixty days from the date of such written notice. Accordingly, the cost during such 60-day period would not exceed $400 even assuming the correctness of the Union's cost figure, before such arbitration takes place. While no one can be certain how long it will take an arbitrator to issue his opinion, it can be reasonably be expected

7A. Such coverage, the Company states, is not equivalent to present coverage but is believed to be as nearly equivalent as is available.

7B. The collective bargaining agreement contains several types of arbitration provisions. In this instance, the parties agree that Article XXI is the applicable arbitration provision. However, the Union and the Company have also agreed that each and both of them will cooperate to shorten the several time periods provided for in said Article XXI which could, under some circumstances, add up to seventy days. In that connection it is noted that the grievance procedure has already been commenced by certain employees (see p. 596 *supra*) and that the Union and the Company, during the hearings in this case, have agreed to expedite the grievance-arbitration procedures in connection with these grievances to the fullest extent within their joint powers so as to complete those procedures long before the expiration of the sixty day period provided for in this opinion.

that an arbitrator will make his decision and file his opinion without delay if he is urged so to do, under the circumstances, by both Company and Union. The Company and Union have both agreed so to do and will be ordered so to do in this Court's aforementioned Order of even date herewith. Under those circumstances, if the employee's position is upheld by the arbitrator, the Company will be required to reimburse the employee for an amount expended to continue such insurance coverage[7C] for uninsured medical care and/or to pay to the employee such other amounts as the arbitrator shall appropriately require. Accordingly also, it would appear that the combination of substitute insurance coverage and the employee's prompt remedy through arbitration should prevent irreparable damage, at least in most instances. In exceptional instances, the employee will also have the opportunity, within the 30-day period after receiving the aforementioned written notice of termination of insurance coverage by the Company, in which to seek, in this Court or in any other appropriate Court, equitable relief. For those reasons, no employee would presently appear to be incurring irreparable harm if such employee submits information as sought by the Company and thereafter, before the issue is resolved by arbitration, any present insurance coverage of a dependent is terminated. This is not a case, such as *Fort Pitt*, in which there is a definite possibility that *all* health insurance coverage will be terminated before the arbitrator's determination is known. Rather, herein, there are definite possibilities that some individual employees will face termination of coverage with regard to certain named dependents. Also, it is to be noted that in *Fort Pitt* the employees were on strike without income, and thus less able to expend any sum of money for any individual coverage.

Thus, there would appear to be no need for any of the immediate equitable relief sought by the Union to prevent the Company from using any of the information it obtains from any employee or from taking action because of the refusal of any employee to supply such information to the Company. There remains the need to examine whether the Union is entitled to any relief concerning the obtention by the Company of such information by any employee. Obviously, certain of such information may well be of a very sensitive nature. The Company has stated that it recognizes that fact and that it will make available such sensitive information to the fewest number of persons.[8] Specifically, the Company has agreed that only the Supervisor of Social Insurance at its plant at Sparrows Point, Maryland, together with no more than two other employees both working under the supervision and direction of that said Supervisor, will be permitted to have access to any such information and that all of such persons will appropriately use and/or maintain such information so that the same will not be available to others, subject to the undertaking, in a given instance, that the said Supervisor may find it necessary to make such information available to one or more of his superiors or co-workers either in the Baltimore, Maryland area or at Bethlehem, Pennsylvania. In any such instance, such Supervisor and each such other person

---

**7C.** Or the nearest equivalent to it.

**8.** During the aforementioned hearings in this case, the Company stated that one of its competitors, the United Steel Corporation, had instituted a similar quest for information not long ago and had discovered approximately 6000 instances in which its employees had listed persons as dependents who were not dependents. Herein, this Court neither accepts nor rejects that factual assertion by the Company. But if some employees have claimed persons as dependents on a false basis, the problems that that poses are not hard to understand. While it may perhaps be arguable that claiming a child of a friend as a dependent as a favor to that child's parents or listing your own girlfriend as your spouse and thus as a dependent is only a degree removed from a teenager of the past managing to jump aboard a trolley car and to ride free, or the prearranged refusal of a collect, long-distance telephone call made by the caller to notify the recipient that the caller has arrived safely at his destination, any such action presents problems for the supplier of the service involved, and in the insurance context, threatens the integrity of an insurance program and its actuarial soundness.

will handle any such information on exactly the same basis as is required with regard to the said Supervisor and either or both of the said two other employees. The Company has also agreed to maintain records of the names of each and every person who has access to any such information so that if there should unfortunately be any unauthorized dissemination or any inappropriate use, it will be possible for the Union to seek in this Court an Order requiring the Company to reveal the name of such person or persons.[8A]

If any information obtained from any employee is handled as so agreed by the parties and as so ordered by this Court, the possible misuse of such information should be minimized. Nevertheless, if the Company is in the future determined, after appropriate arbitration and/or judicial process, to have violated any provision of the collective bargaining agreement or of any statutory or constitutional right of any member of the Union in seeking and/or requiring the provision of any item or items of information from such person,[9] the Company will be subject to such damages and/or the award of other relief as is appropriate in the premises. In the meantime, no employee-member of the Union will be subject to any irreparable damage.

The Union also argues that certain of its members will be confused by the very seeking of the information in question by the Company. The Company has agreed during the July 24, 1981 and July 27, 1981 hearings that any such employee will have the opportunity to confer not only with one or more Company officials, but to be represented by Union officials during any discussion with Company officials about insurance coverage, as well as the opportunity to confer privately with such Union personnel. The Company is hereby required to abide by such agreement.

The parties are required to abide by each and every one of the undertakings which are set forth *supra*. No other relief sought by the Union in this case will be granted for the reasons set forth *supra*.[10] This Court is today entering an appropriate Order.

---

**8A.** This Court asks both Company and Union to exercise their best efforts to agree upon which information is confidential and subject to the protection procedures spelled out in the body of this opinion. Hopefully, the parties will not need to seek further relief in this Court with regard thereto, pending completion of arbitration.

**9.** At this time this Court does not need to reach and does not reach any such issue.

**10.** While the Company has entered into certain undertakings as recited *supra*, it has reiterated during the hearings in this case that it strongly believes the Union is entitled to no relief. The Union, on the other hand, asserts its entitlement to considerably more relief than is granted herein. In reaching an "in-between" result, this Court believes that this is a case in which a little bit of equity imposed by a Court can go a long way toward fairly preserving the status quo until the speediest possible arbitration can be concluded. It is noted, however, that no party has consented to the Order which will be entered today.