**UNITED PARCEL SERVICE (NEW YORK), INC., Plaintiff-Appellee,**

v.

**LOCAL 804, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al., Defendants-Appellants.**

**No. 577, Docket 82–7696.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1982.

Decided Jan. 6, 1983.

---

Eugene S. Friedman, New York City (Franklin K. Moss, and Cohen, Weiss & Simon, New York City, on the brief), for defendants-appellants.

Marvin E. Frankel, New York City (Bettina B. Plevan, Aaron J. Schindel, and Proskauer Rose Goetz & Mendelsohn, New York City, on the brief), for plaintiff-appellee.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

TIMBERS, Circuit Judge:

Local 804, International Brotherhood of Teamsters (the Union), appeals from a preliminary injunction, originally entered on September 15, 1982 and modified two days later, enjoining the Union from interfering with the business of the employer, United Parcel Service (UPS). UPS obtained what is commonly known as a *Boys Markets* injunction[1] to hold the Union to its promise under the collective bargaining agreement not to strike over any arbitrable grievance. This case raises issues with respect to both the conditions precedent to the entry of a *Boys Markets* injunction and the proper scope of such an injunction.

■ We hold that before a *Boys Markets* injunction may be entered the restrictions specified in § 8 as well as in § 9 of the Norris-LaGuardia Act, 29 U.S.C. §§ 108, 109 (1976) (the Act), must be adhered to. Since the district court did not determine whether UPS, in conformance with § 8 of the Act, should have utilized the expedited arbitration procedure provided in the collective bargaining agreement prior to seeking injunctive relief, and since the prospective preliminary injunction entered was not responsive to the limitations in § 9, we vacate the injunction and remand the case for further proceedings.

### I.

The Union and UPS entered into their latest collective bargaining agreement on May 1, 1982.[2] As part of that agreement, UPS agreed to submit grievances to arbitration in return for inclusion of a no-strike clause:

"The Union agrees that it will not cause or permit its members to cause strikes of any kind, stoppages, or any other interference with any of the operations of the Company during the term of the Agreement, so long as the Company abides by the procedure prescribed for the settlement of disputes and differences and the decisions of the arbitrators as provided in this Agreement. The Company agrees that there shall be no lockout during the term of this Agreement, so long as the Union abides by the procedure prescribed for the settlement of disputes and differences and the decisions of the arbitrator as provided in this Agreement."

Article 20, § 4(a).

It is undisputed that six work stoppages occurred during the period from March 1981 through September 1982.[3] Although there was some testimony at the preliminary injunction hearing that not all of the work stoppages stemmed from arbitrable grievances, all at least colorably violated the Union's no-strike promise.

The work stoppage that precipitated this action, the fifth of the six enumerated, occurred on August 24–25, 1982, at the UPS facility in Melville, New York. Apparently it resulted from a protest over UPS' handling of a disciplinary matter. UPS consequently commenced this action on August

---

1. *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970).

2. The arbitration and no-strike provisions were identical with those in the previous agreement which was in effect from May 1, 1979 until May 1, 1982.

3. Briefly, the work stoppages consisted of the following:

    (1) March 1981 strike in New York City area prompted by Union grievances concerning alleged harassment of workers and/or performance of bargaining unit work by supervisors. A TRO and a preliminary injunction were issued by Judge Brieant.

    (2) August 1981 thirty minute work stoppage at UPS' Maspeth facility over UPS' handling of an employee grievance.

    (3) January 1982 work stoppage over disciplinary suspension of a different employee at UPS' Maspeth facility.

    (4) May 1982 work stoppage at UPS' Manhattan facility over layoffs and payment of a cost of living increase. Judge Brieant found the Union in contempt of the preliminary injunction previously entered. (Preliminary injunction expired in May 1982 when the new collective bargaining agreement became effective.)

    (5) August 24–25, 1982 strike over a UPS disciplinary measure at its Melville facility which prompted UPS to apply for the TRO which initiated the instant action.

    (6) September 8, 1982 strike at UPS' Maspeth facility over disciplinary measures.

25, alleging a pattern of unlawful strikes and seeking injunctive relief. UPS withdrew its application for a TRO the next day when its employees returned to work. On September 8, the parties appeared before Judge McLaughlin and agreed upon a date in mid-October for a preliminary injunction hearing.

That afternoon, employees struck at the Maspeth facility of UPS, this time over disciplinary matters and UPS' refusal to allow an employee who had been absent due to injury to return without medical clearance. On September 9, 1982, UPS filed an amended complaint seeking a TRO. In Judge McLaughlin's absence,[4] a magistrate heard testimony and reported his findings over the phone to the judge, recommending that the TRO be granted. After the Union's counsel stated his objections to the magistrate's recommendation over the phone, the judge granted the TRO.[5]

On September 15, at the conclusion of the preliminary injunction hearing held upon Judge McLaughlin's return, he issued orally from the bench a broad prospective injunction, prohibiting all future strikes in violation of the collective bargaining agreement, regardless of whether the strikes were over arbitrable grievances. The judge found that the Union had engaged in a pattern of strike activity and that "the evidence [was] overwhelming that most, if not all, of these strikes were over arbitrable grievances". UPS thereafter submitted a narrower proposed written order, which the judge signed on September 17, providing in relevant part as follows:

> "ORDERED, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that, pending a final determination of this action, defendants, their officers, agents, representatives, members, employees and attorneys, and all persons in active concert or participation with them having notice from any source or in any manner of this Order be and they hereby are enjoined and
>
> (1) Restrained from calling, causing, inducing, encouraging, authorizing, conducting, continuing in or engaging in any strike, concerted work stoppage, concerted work slowdown, sitdown or any other act of coercion or interference with plaintiff's normal operations, which strike, stoppage, slowdown, sitdown or other act is in violation of the collective bargaining agreement between the United Parcel Service and Local 804, IBT and is in connection with a dispute or claim subject to the grievance and arbitration procedures of said collective bargaining agreement; and
>
> (2) Restrained from, by threats or otherwise, interfering with or inducing or attempting to induce any person to interfere with or otherwise affect the ordinary continuation of plaintiff's business and from taking any action which would interfere with this Court's jurisdiction in the premises. . . . "

In short, the preliminary injunction enjoined the Union from striking over any arbitrable grievance for the life of the agreement.

From the oral and written preliminary injunctions, as well as from various prior orders entered in this proceeding, the Union has appealed.

The Union on appeal urges essentially two objections to the preliminary injunction. First, it argues that no preliminary

---

4. He was at the Second Circuit Judicial Conference then being held at Hershey, Pennsylvania.

5. The Union challenges the validity of the TRO on several grounds. It asserts that the magistrate exceeded his statutory and constitutional powers, and that the hearing did not provide the safeguards required by the Act. Although TROs normally are not appealable, see *Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560 (2 Cir.1974), the Union argues that an appellate court may consider the merits of a TRO in conjunction with review of a preliminary injunction, the latter being appealable. Its reliance on *Emery Air Freight Corp. v. Local Union 295, I.B.T.*, 449 F.2d 586 (2 Cir.1971), *cert. denied*, 405 U.S. 1066 (1972), however, is misplaced. Review in that case was premised on an appeal from subsequent contempt proceedings. *Id.* at 587. The Union in the instant case similarly might have challenged the propriety of the TRO if a contempt proceeding had been commenced.

injunction should have been entered because UPS failed to demand arbitration prior to commencing this action. Second, it argues that, irrespective of the failure of UPS to demand arbitration, the preliminary injunction entered was overbroad, in derogation of the principles embodied in the Norris-LaGuardia Act. We shall consider each of these arguments in order.

## II.

Turning first to the prerequisites for a *Boys Markets* injunction, the Union argues that a prior demand for arbitration is an absolute condition precedent to such an injunction. In the alternative, it argues that such a demand was required under the circumstances of this case. It premises both arguments on *Boys Markets, Inc. v. Retail Clerks Union, Local 770, supra* note 1, as well as on § 8 of the Act.

We address the Union's broader claim first. To assess its merits, we turn to the Supreme Court's accommodation in *Boys Markets* between the prohibition against strike injunctions in the Norris-LaGuardia Act and the national policy of encouraging arbitration as expressed in § 301(a) of the National Labor Relations Act, 29 U.S.C. § 185(a) (1976) (NLRA).[6]

Animating the *Boys Markets* decision was the concern that employers had insufficient incentive to enter into arbitration agreements unless accompanied by no-strike provisions enforceable by injunction, the quid pro quo for the employer's agreement to submit grievances to arbitration. 398 U.S. at 248–49. The Court therefore carved out an exception to the Norris-LaGuardia Act, holding that strikes over arbitrable grievances could be enjoined pending arbitration of the underlying grievance. *Id.* at 254. The Union reasons that, since the rationale

underlying a *Boys Markets* injunction is to protect the arbitration process, a party must demand arbitration prior to seeking injunctive relief. Invoking the arbitration procedure before commencing an action arguably demonstrates the employer's willingness to arbitrate and ensures that the arbitrator can reach the merits of the controversy as soon as possible. To be sure, the employer in *Boys Markets* demanded arbitration before commencing the action. The Court has yet to rule, however, whether a prior demand is a prerequisite for a *Boys Markets* injunction. *Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 401 n.3 (1976). We decline to adopt what strikes us as the strained reading of *Boys Markets* urged by the Union.

The Court in *Boys Markets* held that an employer should be ordered to arbitrate as a condition to obtaining an injunction against a strike. 398 U.S. at 254. The words "ordered to arbitrate" themselves imply that a prior demand is not necessary. Indeed, a prior demand for arbitration may be only an empty formality. Since arbitration is not expected to resolve the underlying grievance before entry of a *Boys Markets* injunction,[7] we doubt that requiring such a "procedural nicety" would serve the underlying purpose of protecting the arbitration process. As the Fifth Circuit reasoned in *Jacksonville Maritime Association v. I.L.A.,* 571 F.2d 319, 324–25 (5 Cir.1978), the demand for arbitration itself cannot resolve the labor dispute and the resultant delay might cause the employer's losses to escalate and increase the pressure upon the employer to accept the union's demands. *But see Elevator Manufacturer's Association v. I.U.E.C., Local No. 1,* 331 F.Supp. 165, 167 (S.D.N.Y.1971) (prior demand an absolute condition to obtaining a *Boys Mar-*

---

**6.** *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564 (1960); *United Steelworkers of America v. Enterprise Wheel Car Corp.,* 363 U.S. 593 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960).

**7.** Most arbitration machinery is not suited to expedited resolution of disputes. *See* Elkouri, How Arbitration Works 9–10 (3d ed. 1973).

Thus, invoking the arbitral process before obtaining a *Boys Markets* injunction would not obviate the court's need to engage in a preliminary interpretation of the contract. *Boys Markets, supra,* 398 U.S. at 254. Normally, only after injunctive relief has been obtained will the arbitrator hear the case. *Buffalo Forge, supra,* 428 U.S. at 411–12.

*kets* injunction). We agree with the Fifth Circuit that, as long as the employer is ordered to arbitrate as a condition to obtaining an injunction, *Boys Markets* does not require the formality in every case of demanding arbitration prior to seeking the injunction.

The Union urges that such a reading of *Boys Markets* would eviscerate § 8 of the Norris-LaGuardia Act, the so-called "clean hands" provision, which states:

> "§ 108. Noncompliance with obligations involved in labor disputes or failure to settle by negotiation or arbitration as preventing injunctive relief.
>
> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

29 U.S.C. § 108 (1976). The Union invites us to construe this "clean hands" provision to require that the employer must demand arbitration as an absolute condition precedent to obtaining a *Boys Markets* injunction in all cases. We decline the invitation. Although we hold that § 8 does apply to the instant case, we decline to hold that it requires a prior demand for arbitration in all cases.

Before addressing the merits of the Union's claim, we hold first that § 8 does apply to *Boys Markets* injunctions. While *Boys Markets* made an inroad into § 4 of the Act to give effect to the national policy of encouraging extrajudicial dispute resolution, other restrictions in the Act remain applicable to *Boys Markets* injunctions, at least to the extent consistent with the pro-arbitration policy enunciated in *Boys Markets.* In *New York Telephone Co. v. C.W.A.,* 445 F.2d 39, 49–50 (2 Cir.1971), we held that the specificity requirements in § 9 of the Act which circumscribe the scope of labor injunctions were consonant with *Boys Markets.* We later held that the requirements in § 7 of the Act for a hearing and testimony in open court also were applicable in the *Boys Markets* context. *Hoh v. Pepsico, Inc., supra* note 5, at 560. Similarly, we hold here that, far from impeding the *Boys Markets* policy, § 8 furthers its concern for fostering extrajudicial dispute resolution. Since the very purpose of the *Boys Markets* injunction is to vindicate the arbitration process, a party which does not make "every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration" should be precluded from seeking relief in a federal court. *Cf. Brotherhood of Railroad Trainmen v. Toledo, P. & W.R.R.,* 321 U.S. 50, 58 (1944) (§ 8 applicable in Railway Labor Act injunction cases); *Local 553, Transport Workers Union v. Eastern Air Lines, Inc.,* 695 F.2d 668, 679 (2 Cir.1982) (§ 8 entirely consistent with purpose and letter of Railway Labor Act); *Brotherhood of Railroad Trainmen v. Akron & B.B.R.,* 385 F.2d 581, 613–14 (D.C.Cir.1967) (§ 8 applicable to Railway Labor Act cases to extent consonant with imperatives in Act protecting the public interest), *cert. denied,* 390 U.S. 923 (1968). Giving effect to § 8 therefore does serve the accommodation reached in *Boys Markets* between the Norris-LaGuardia Act and § 301(a) of the NLRA.

UPS, however, argues that the provisions of § 8 are not pertinent to the instant case. It asserts that § 8 requires only that parties use available "governmental machinery of . . . voluntary arbitration", as opposed to any type of "voluntary arbitration" that is available. True, the Supreme Court in *Brotherhood of Railroad Trainmen v. Toledo, P. & W.R.R., supra,* 321 U.S. at 57 n.11, suggested in dictum that "governmental machinery" modified "voluntary arbitration". *See also Charles D. Bonanno Linen Service, Inc. v. McCarthy,* 532 F.2d 189, 190–91 (1 Cir.1976). Other courts, however, have reasoned that the "or voluntary arbitration" clause stands independently. Under that reading, parties must exhaust all channels of arbitration before resorting to a

federal court. *See, e.g., Carter v. Herrin Motor Freight Lines, Inc.,* 131 F.2d 557, 560–61 (5 Cir.1942); *Jacksonville Maritime Association, supra,* 571 F.2d at 326–27 (Godbold, J., dissenting).

■ Although the language of § 8 is ambiguous, the overriding emphasis of the Act upon nonjudicial resolution of disputes indicates that the parties must exhaust all reasonable methods of nonjudicial dispute resolution before seeking injunctive relief. It would make little sense to require use of governmental offices to arbitrate a dispute but not require use of arbitration machinery established in the parties' own collective bargaining agreement. The word "voluntary" suggests that the drafters intended to refer to all arbitration agreements reached by the parties, not only arbitration machinery provided by the government.

What legislative history there is appears to support that conclusion. Nowhere is there any rationale suggesting why resort to governmental arbitration machinery in particular should be required. Rather, the legislative intent gleaned from the congressional reports appears to encompass all forms of arbitration. For instance, in analyzing § 8, the House Report explained, "There can be no reasonable objection to this section because it is universally believed that disputes should be settled without resort to courts wherever possible, and the settlement of disputes by conciliation and arbitration, instead of by strikes, has become the rule rather than the exception." H.R.Rep. No. 669, 72d Cong., 1st Sess. 10 (1932). The Senate Report referred to § 8 in like vein: "Your committee thoroughly indorses the principle of mediation, negotiation, and voluntary arbitration. Laws already on the statute books affirm the belief in settlement rather than resort to force." S.Rep. No. 1060, 71st Cong., 2d Sess. 12 (1931). Comments on the floor of the House also depict § 8 in a broad context. *E.g.,* "[Section 8] provides that a complainant shall not be entitled to an injunction if he has not complied with any contract or obligation on his part or has not made every reasonable effort to settle the dispute by

the available methods of arbitration or mediation." 75 Cong.Rec. 5464 (1932) (statement of Rep. O'Connor). *See also id.* at 5508 (1932) (statement of Rep. Thatcher). We believe that it would be consonant with the legislative intent to read § 8 to require that parties utilize all available arbitration machinery, not just that provided by the government, before resorting to a federal court for injunctive relief.

■ We hold, however, that "every reasonable effort" to resolve a dispute through nonjudicial means does not necessarily include a prior demand for arbitration. In view of the lengthy arbitration process, little if anything can be gained by demanding arbitration when confronted with an ongoing strike. Despite the demand, a federal court nevertheless may grant temporary injunctive relief as well as render a decision on the merits under *Boys Markets* well before the arbitrator can decide the case. An employer's failure to demand arbitration, therefore, does not necessarily tip the equitable scales so as to preclude a claim for injunctive relief. As long as a demand for arbitration has little chance of inducing settlement of the dispute before entry of a *Boys Markets* injunction, the "clean hands" provision does not require the formality of demanding arbitration on the way to the courthouse door.

This does not end our inquiry. The question remains whether *Boys Markets* or § 8 required the employer in the instant labor dispute to invoke the available arbitration machinery. In contrast to the typical situation, a demand for arbitration in this case may not have been a mere formality. The parties explicitly provided in the collective bargaining agreement that either party could demand *expedited* arbitration in the wake of an alleged violation of the no-strike clause:

> "In the event of an alleged violation of this Section 4, either the Company or the Union shall have the right to waive the normal adjustment and arbitration provisions referred to in Article 20, Section 3, and submit, *for immediate arbitration,* the alleged violation of this section pursu-

ant to the provisions of Section 3. *Such dispute shall be submitted to arbitration within twenty-four (24) hours after receipt of notice by the American Arbitration Association and an award issued not later than twelve (12) hours after the conclusion of the hearing."* (emphasis added).

Article 20, § 4(b). Although the provision in the agreement is not phrased in the imperative, it clearly envisages a prompt, effective extrajudicial means of resolving alleged breaches of the no-strike clause. Submission to the expedited arbitration procedure could have obviated the need for a *Boys Markets* injunction. For example, the arbitrator might have been able to rule whether the Union's work stoppage breached the no-strike clause before a TRO hearing could have been held and an order entered. UPS then could have applied for an injunction to enforce the terms of the arbitration award—relief which would not run afoul of the restrictions in the Act. *Pacific Maritime Association v. International Longshoremen's & Warehousemen's Union,* 454 F.2d 262, 263–64 (9 Cir.1971); *New Orleans Steamship Association v. General Longshore Workers Local No. 1418,* 389 F.2d 369, 371–73 (5 Cir.), *cert. denied,* 393 U.S. 828 (1968). In other words, by utilizing the expedited arbitration procedure, the employer might have been able to obtain relief equivalent to that available through a *Boys Markets* injunction. Thus, utilizing the expedited procedure in such situations should be viewed as part of the required "reasonable effort" to resolve the dispute through extrajudicial means. It should be a condition precedent in such situations to injunctive relief under § 8 of the Act.

We are mindful that in all likelihood, even under an expedited arbitration procedure, an arbitrator might not be able to finalize an award before a TRO could be entered. To determine whether resort to arbitration in that event would still be re-

quired under § 8, we turn for guidance to the pro-arbitration policy expressed in § 301(a) of the NLRA and further elaborated in *Boys Markets.* Even if a TRO subsequently might be entered, submission of the dispute to arbitration prior to commencing an action still could serve a function central to the national labor policy favoring arbitration—the federal court might gain the benefit of an arbitrator's ruling before holding a hearing on an application for a TRO or a preliminary injunction. Thus, a determination whether the strike breached the Union's duty to arbitrate under the collective bargaining agreement might already have been made prior to entry of a TRO or a preliminary injunction. As a consequence, the court would not have to invade the province of the arbitrator to determine whether the underlying dispute was over an arbitrable grievance and thus subject to the arbitration procedure. As the Court in *Buffalo Forge* emphasized, "The parties have agreed to submit to grievance procedures and arbitrate, not to litigate. They have not contracted for a judicial preview of the facts and the law. . . . It is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly pre-empted by judicial views of the facts and the meaning of contracts if this procedure is to be permitted." 428 U.S. at 411–12.

An employer who applies for a preliminary injunction without first invoking the arbitration machinery gains insulation from an arbitrator's possible adverse ruling, at least until after the hearing on an application for a TRO or a preliminary injunction.[8] Even the *Jacksonville* court recognized that requiring prompt submission of claims to arbitration in some instances would not be an empty formality, but would ensure that the arbitrator's interpretation governed the

---

8. Such an employer would have obtained the relief desired (enjoining the strike) without an arbitrator ruling that the arbitration clause in the contract does cover the underlying grievance. Preventing federal courts from making

preliminary interpretations of the effect of provisions in the collective bargaining agreement lies at the heart of the national pro-arbitration policy. *See Buffalo Forge, supra,* 428 U.S. at 410–11.

court's subsequent interpretation of the collective bargaining agreement. 571 F.2d at 325.[9] Leaving to arbitrators the task of interpreting the collective agreement is one of the primary goals of our national labor policy, *Warrior & Gulf Navigation Co., supra* note 6, 363 U.S. at 581–83, and is consistent with § 8. To read *Boys Markets* to allow an employer to bypass expedited arbitration machinery for which the collective bargaining agreement explicitly provides in cases of alleged breach of the no-strike agreement would be to turn *Boys Markets* on its head. The parties here provided a mechanism to allow an arbitrator to rule on the purported breach. Their choice should be respected absent evidence of abuse.[10]

Our decision in *Hoh v. Pepsico, Inc., supra* note 5, bolsters the above analysis. In *Hoh* several unions sought a *Boys Markets* injunction to enjoin Pepsico from closing its Rheingold brewery in Brooklyn pending arbitration. The unions alleged that the decision to terminate operations violated a pledge the employer had made in entering into the current collective bargaining agreement. We affirmed the district court's denial of the request for a preliminary injunction "most significantly" because "the unions' case was lacking in equity because of their failure effectively to invoke arbitration remedies readily available to them." 491 F.2d at 561–62. If the unions had utilized the expedited arbitration machinery

provided for in the collective bargaining agreement, then resort to the court might have become unnecessary. The question of whether the employer or the union has used reasonable efforts to resolve the dispute by extrajudicial means comes down, in our view, to whether invocation of the available arbitration process could have been expected to allow the arbitrator to decide whether the work stoppage stemmed from an arbitrable grievance before that determination is required to be made by a federal court as part of a *Boys Markets* proceeding.

■ Under the circumstances of the instant case, whether resort to the expedited arbitration machinery was required by § 8 is unclear on the record before us. The parties' collective bargaining agreement specified that expedited arbitration would be available in case of an alleged breach of the no-strike clause. What purpose that expedited arbitration clause would serve if UPS automatically had sought injunctive relief instead of submitting its claim to arbitration is not apparent.[11] The agreement provides that the arbitration hearing must proceed on an expedited basis. It requires the arbitrator to issue an award within twelve hours after the conclusion of the hearing. The agreement does not specify, however, how long the hearing may last.[12] On the present record, therefore, we

**9.** We are mindful that requiring a district court to determine whether demanding arbitration prior to seeking injunctive relief would constitute a "reasonable effort" to resolve the dispute adds another procedural step that could prolong the *Boys Markets* hearing and delay ultimate resolution of the underlying grievance. *See Jacksonville, supra,* 571 F.2d at 324–25. Inquiring whether a collective bargaining agreement provides for expedited arbitration, however, should not prove to be overly time consuming or complex. Moreover, parties who have included such arbitration procedures in their agreements are put on notice that before seeking injunctive relief they must invoke those procedures.

**10.** Policy concerns buttress this conclusion. The demand for arbitration in and of itself may dissipate pressures and quell the strike. *See Jacksonville, supra,* 571 F.2d at 327 (Godbold, J., dissenting). Requiring an employer to demand arbitration before commencing an action

may well motivate the employer to demonstrate his good faith.

**11.** UPS claims that the expedited arbitration clause is merely a holdover from the pre-*Boys Markets* era when an expedited arbitration clause appeared to be the best remedy for a union's breach of its no-strike pledge. Whether or not UPS' contention is correct, the fact is that the clause was included in the collective bargaining agreement as recently as May 1, 1982 and it remains there. Even if UPS intends to use the provision only in *Buffalo Forge* type situations in which strikes are not enjoinable under *Boys Markets,* the provision is plainly available for all alleged breaches of the no-strike clause.

**12.** For results of the expedited arbitration to be available at the preliminary injunction hearing, the arbitrator's decision ordinarily would have to be made within five days, the duration of a

cannot determine whether the arbitration would take several days or several weeks. On remand, the district court should determine how effective the expedited arbitration procedure would be. If utilization of that procedure could have provided an "immediate, effective remedy", *Boys Markets, supra,* 398 U.S. at 249, or if it would have allowed the arbitrator's interpretation to control at the *Boys Markets* injunction hearing, then a prior demand for arbitration would have been no mere formality. Rather, it would have constituted a "reasonable effort" to resolve the dispute and therefore would have been a condition precedent to injunctive relief under *Boys Markets* and § 8 of the Norris-LaGuardia Act.

To enable the district court to make these critical determinations, we vacate the preliminary injunction and remand the case to the district court with instructions to proceed in accordance with this opinion.

### III.

This brings us to the issue with respect to the scope of the preliminary injunction referred to at the outset of this opinion. Since the district court on remand may decide that a prior demand under the expedited arbitration procedure was not required, we shall consider the scope of the preliminary injunction that was entered.[13] We conclude that the court's grant of prospective relief overstepped the bounds permitted by § 9 of the Act.

We must first determine whether any injunction may issue prospectively, enjoining unspecified conduct that may occur in the future rather than enjoining specific acts that already have occurred. In *Boys Markets,* the Court emphasized that it carved out only a narrow exception to the restrictions of the Act on labor injunctions:

> "Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance."

398 U.S. at 253–54. The Court reached an accommodation between the limitations in the Act and the national policy of encouraging peaceful extrajudicial resolution of disputes. The question remains whether a prospective injunction would further that accommodation, especially when the employer has alleged a pattern of strike activity in violation of the union's no-strike promise.

The literal language of the Act militates against granting a prospective injunction. Section 9 provides that no "restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court ... and every ... injunction ... shall include *only* a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case...." 29 U.S.C. § 109 (1976) (emphasis added). Construing that language, the Fifth Circuit in *United*

---

temporary restraining order under § 7 of the Norris-LaGuardia Act. 29 U.S.C. § 107 (1976). A preliminary injunction hearing, however, often does not follow directly upon entry of the TRO. If there is no emergency, the court may postpone the hearing to a more convenient time or the union may agree to extend the TRO on consent, thus obviating the need for an immediate hearing. The court therefore should find that § 8 requires a prior demand for arbitration as long as it seems likely that the arbitrator will reach a decision before the preliminary injunction hearing reasonably may be expected to be concluded.

**13.** We hold that the court did not abuse its discretion in finding likelihood of success on the merits and irreparable harm. The Union's argument that its work stoppages did not stem from arbitrable grievances is barely colorable. Certainly if the work stoppages had continued, they would have caused serious harm to UPS in its delivery operations and possibly to the general public which is dependent upon such carrier service. *Elevator Manufacturers' Ass'n v. Local 1, I.U.E.C.,* 689 F.2d 382, 387 (2 Cir.1982).

*States Steel Corp. v. UMWA* (UMWA I), 519 F.2d 1236, 1245 (5 Cir.1975), *cert. denied,* 428 U.S. 910 (1976), held that no prospective injunction could issue, despite an alleged pattern of seven strikes during the life of the contract. It reasoned that the "carefully drawn guidelines in *Boys Markets* clearly call for case-by-case adjudication." *See also United States Steel Corp. v. UMWA* (UMWA II), 598 F.2d 363 (5 Cir. 1979).

Other courts have held that § 9 should not be construed so strictly. For example, in *Old Ben Coal Corp. v. Local Union No. 1487 UMWA* (UMWA III), 500 F.2d 950 (7 Cir.1974), the Seventh Circuit reached a different accommodation between the *Boys Markets* pro-arbitration policy and the restraints provided for in the Act. It held that *Boys Markets* permits granting as broad an injunction as a union's prior conduct warranted. *Id.* at 953. The court reasoned that an employer should not be forced to go to court repeatedly to enjoin successive violations of the no-strike promise. Rather, an employer should be able to obtain prospective injunctive relief and thereby gain the advantage of instituting contempt proceedings should the work stoppages continue. The court in *Old Ben Coal* therefore upheld a broad prospective injunction that forbade all future strikes by the union in violation of the collective bargaining agreement. Indeed, while the Seventh Circuit's opinion seems to eviscerate the restrictions in § 9, § 7 appears to be more amenable to the court's interpretation. The latter section provides in part that a court may grant an injunction after finding that "unlawful acts have been threatened and *will be* committed unless restrained." 29 U.S.C. § 107 (emphasis added); *see also Boys Markets, supra,* 398 U.S. at 254.

We decline to follow what we regard as the extremes of both the Fifth and the Seventh Circuits. We hold, in accordance with the Third Circuit's opinion in *United States Steel Corp. v. UMWA* (UMWA IV), 534 F.2d 1063 (3 Cir.1976), that a court may grant a prospective injunction, but only if it finds that the union has engaged in a pattern of strike activity [14] and that there is a likelihood that it may repeat such violations in the future. In an egregious situation, an employer should not be forced to seek injunctive relief repeatedly when the union's conduct has shown flagrant disrespect for the arbitration process that is the quid pro quo for its no-strike promise. To hold otherwise would undermine the value of extrajudicial dispute resolution that is central to the *Boys Markets* decision. To avoid the abuses inherent in strike injunctions, however, the entry of a prospective injunction must be accompanied by strict safeguards.[15]

**14.** We note in passing that we are troubled by UPS' enumeration of at least one work stoppage in its complaint, that of August 1981, *see* note 3, *supra,* which it never submitted to arbitration. To demonstrate a pattern of strike activity in violation of the no-strike clause, an employer should be able to demonstrate that it submitted to arbitration its claims of the union's prior breaches. As discussed above in Section II of this opinion, a court should be loath to grant injunctive relief when it appears that an employer has shunned the arbitration process. An employer, like a union, should utilize the arbitration procedure to vindicate its rights before resorting to the judicial forum.

**15.** Our decision in *New York Telephone Co. v. C.W.A., supra,* holding that a *Boys Markets* injunction must be responsive to the specificity requirements in § 9 of the Act, lends support to our holding on this aspect of the case. In *New York Telephone,* the company had obtained a TRO in June 1970 to restrain the union from boycotting overtime in protest to the company's involuntary transfer of switchmen. The TRO was extended on consent. Six months later the union commenced a strike over the company's importation of workers from other areas to upgrade service in New York City. The district court held the union in contempt for violating the terms of the prior TRO. We reversed, holding that the original restraining order did not apply to subsequent work stoppages, despite the TRO's broad language which enjoined the union "from engaging in, or organizing, inducing or encouraging others to engage in any strike, work stoppage, boycott of overtime work, slowdown or any other form of interference with the business of plaintiff." 445 F.2d at 43. Rather, we pointed out that the TRO was limited to the specific work stoppage alleged in the complaint. We found no impediment in harmonizing the limitations in § 9 with the pro-arbitration policy enunciated in *Boys Markets.* Despite the Union's argument to the

The Third Circuit in *UMWA IV* has suggested what we regard as appropriate criteria:

> "The power of a federal court to decide the meaning of a labor agreement in a § 301 suit is clear. Once it has done so it should not be required to relitigate essentially the same issue in a slightly different context over and over again.
>
> \* \* \*
>
> Before prospective injunctive relief is ordered the district court must, we think, make specific findings based on evidence in the record as to the types of violations which have occurred in the past and limit injunctive relief to the likelihood of their recurrence, or to new and different kinds of violations which may be expected to occur in the future. The court, must, moreover, relate the likelihood of recurrence or occurrence to some act, omission or responsibility of each defendant against whom such injunctive relief is ordered."

534 F.2d at 1077. In conformity with the Act, a court must make specific findings at the outset with respect both to the genesis of prior work stoppages and to the likelihood of the same pattern recurring. Section 9 requires that, unless the same unlawful pattern is likely to continue, no prospective injunction should be entered. Such a safeguard may be of critical importance to the union. For example, even if a court finds that a union repeatedly has violated its no-strike pledge by striking in protest to the employer's disciplinary measures, the Act forbids proscribing the union from striking in the future over overtime policies that may not have been foreseen by either party at the preliminary injunction hearing.

■ In the instant case, the court made neither finding prerequisite to entering a prospective injunction. As for the union's previous work stoppages, the court found only that "evidence was overwhelming that most, if not all, of these strikes were over arbitrable grievances and were in violation of the no-strike obligation." That hardly satisfies the specificity requirement of § 9. No finding was made as to the cause of the six enumerated work stoppages or as to whether any specific pattern emerged. Nor did the court make any finding regarding the type and likelihood of continuing violations. The court's assertion that there was "a distinct possibility of recurrence of this conduct" is deficient. It does not make the requisite correlation between the likelihood of recurrence and "some act, omission or responsibility of each defendant against whom such injunctive relief is ordered." The court's order in essence was "an order to work every day for the life of the contract," *UMWA I, supra,* 519 F.2d at 1245. As such, it must be vacated. We express no opinion as to whether the union has engaged in a pattern of work stoppages violative of its no-strike pledge and, if so, whether that type of violation is likely to continue.

We hold that the preliminary injunctive was impermissibly overbroad and must be vacated—wholly aside from whether the conditions precedent for a *Boys Markets* injunction were complied with.

We vacate the preliminary injunction and remand the case to the district court for further proceedings consistent with this opinion. With respect to any further appealable orders resulting from such proceedings, we retain appellate jurisdiction and review shall be by this panel.

The mandate shall issue forthwith.

Costs to appellants.

Vacated and remanded.

---

contrary, we do not believe that limiting injunctive relief to specific acts when the employer has alleged a pattern of strike activity would further the accommodation between *Boys Markets* and the Norris-LaGuardia Act.