WESTMORELAND COAL COMPANY, INC., Plaintiff–Appellee,

v.

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA; Richard L. Trumka, President; District 28, UMWA; Jackie Stump, President; Don McCamey, Acting President and Secretary/Treasurer; Sam Church, Field Representative; Roger Tomlinson, Field Representative; Local Union 1607, United Mine Workers of America; Roger Williams, President; Rocky Joe Catron, Vice President; Samuel B. Jessee, Recording President; Gary Kennedy, Financial Secretary; Charles Hubbard, Treasurer; Kenneth W. Mullins, Committeeman; Kenneth W. Blevins, Committeeman; Gerald L. Lane, Committeeman; Earlin Sanders, Committeeman; Charles Daugherty, Chairman; William Gill, Committeeman; Local Union 8181, United Mine Workers of America; Curtis A. McClellan, President; Earl N. Johnson, Vice President; B.A. McGee, Financial Secretary; John L. Gibson, Treasurer; Teddy Collins, Jr., Recording Secretary; C.W. Moore, Committeeman; Noah Blevins, Committeeman; Frank Fields, Committeeman; Local Union 1976, United Mine Workers of America; Sam Ball, President; Jerry Blevins, Financial Secretary; Danny Holt, Recording Secretary; Lester Bloomer, Committeeman; Danny Kern, Committeeman; Stanley Smith, Committeeman; Bobby Yates, Chairman; Local Union 2158, United Mine Workers of America; Gordon Blevins, President; Ted Sizemore, Financial Secretary; Johnny Cooper, Committeeman; Local Union 1355, United Mine Workers of America; Gary Long, President; Terry Cumbo, Recording Secretary; Harold E. Craft, Committeeman; Adrian D. Kelly, Committeeman; Willie Stanley, Committeeman; Local Union 1405, United Mine Workers of America; Buford Mitchell, President; Larry Thacker, Financial Secretary; David Pridemore, Recording Secretary; Arthur Sturgill, Committeeman; Robert H. Sampson, Committeeman; Robert Love, Committeeman; Phillip R. Ball, Committeeman; Thomas W. Edwards, Committeeman, Defendants–Appellants.

No. 89–2780.

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1990.

Decided Aug. 6, 1990.

Michael James Passino, Passino & Hildebrand, Nashville, Tenn. (Robert H. Stropp, Jr., William O. Shults, Intern. Union United Mine Workers of America, Washington, D.C., James J. Vergara, Jr., Vergara and Associates, Hopewell, Va., on brief), for defendants-appellants.

⸱ Thomas Peter Gies, Crowell & Moring, Washington, D.C. (J. Michael Klise, Crowell & Moring, Washington, D.C., F. Thomas Rubenstein, Asst. Gen. Counsel, Westmoreland Coal Co., Big Stone Gap, Va., on brief), for plaintiff-appellee.

Before SPROUSE, CHAPMAN and WILKINS, Circuit Judges.

WILKINS, Circuit Judge:

The International Union, District 28, and several local unions and individual members of the United Mine Workers of Amer-

ica (Union) appeal from a preliminary injunction issued on the motion of Westmoreland Coal Company. The issues presented are (1) whether under section 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185 (West 1978), the district court had the authority to issue a preliminary injunction, (2) whether the injunction could properly grant prospective relief, and (3) whether the injunction was overbroad and thus failed to comply with section 9 of the Norris–LaGuardia Act, 29 U.S.C.A. § 109 (West 1973). We affirm in part, vacate in part, and remand.

## I.

At its bituminous coal operations in Wise and Lee Counties, Virginia, Westmoreland employs approximately 700 Union members represented by District 28 and several local unions. A collective bargaining agreement between the Union and Westmoreland provides for a mandatory grievance and arbitration process for disputes over contractual matters and "local trouble of any kind." Under the agreement, this mandatory process is the exclusive means of settling disputes. The Union concedes that these provisions create an implied agreement not to strike over arbitrable differences.

Trouble between Westmoreland and the Union began when Westmoreland miners participated in a series of sympathy strikes in support of striking coal miners employed by Pittston Coal Group. These sympathy strikes began on April 21, 1989, shortly after Pittston's operations in Virginia, West Virginia, and Kentucky were closed. They continued intermittently until July 17, 1989, and were generally precipitated by the arrival of sign-carrying "stranger pickets" at Westmoreland facilities.[1] When confronted with these pickets, Westmoreland employees would refuse to cross the picket lines and a work stoppage would ensue.

Contemporaneously with the sympathy strikes in Virginia, the Union was also striking coal operations of companies in five other states. In response to these sympathy strikes, on June 26, 1989, Region 9 of the NLRB sought a section 10($l$) injunction. The district court in the Southern District of West Virginia found that the Union's sympathy strikes were unfair labor practices in the form of illegal secondary boycotts in violation of 29 U.S.C.A. § 158(b)(4)(i), (ii)(B) (West 1973), and it directed the Union to end its sympathy strikes against Westmoreland and others. The injunction was designed to have nationwide effect and specifically included District 28. Despite the injunction, additional, intermittent work stoppages and picketing at Westmoreland continued during the week of June 26. Later, when Union president Richard Trumka called for a memorial period on July 10–14 (ostensibly a "cooling off period" in the wake of the June 26 injunction), Westmoreland miners did not work although Westmoreland was specifically excluded. The miners did return to work on July 17 when Trumka issued a nationwide call for a return to work.

As a result of their participation in the work stoppages, over 30 employees at Westmoreland's Bullitt Mine Complex in Virginia incurred unexcused absences. In accordance with the collective bargaining agreement, Westmoreland took disciplinary action against these employees, notifying three of them that they were to be temporarily suspended from July 24 to July 25.

On Saturday, July 22, Sam Church, a former Union president, telephoned Larry Jackson, the Vice President of Westmoreland's Virginia operations, to complain about the pending suspensions.[2] In unrebutted testimony Jackson recounted his conversation with Church:

> On July 22, Saturday, I received a telephone call from Mr. Sam Church at my home. Mr. Church said that he was aware that we were going to suspend three employees for two days for absentee problems. I told him that was right.

1. These "stranger pickets" were not employees of Westmoreland. They claimed to be Pittston employees and carried signs related to the labor dispute with that company.

2. Church became a field representative for District 28 on July 31, 1989.

He asked me to reconsider that. He said it served no purpose to do that, all it would do was upset the workforce. I told Mr. Church that I had done all the reconsidering that I was prepared to do on the issue; that the suspensions would stand and there was a purpose in doing this. The purpose, once again, I repeated to him, was to let the United Mine Workers know that we were not happy with the unauthorized work stoppages and to encourage our employees to come to work every day. We needed them. Mr. Church went on to tell me, he said, "Well, there's three or four busloads of Ohio people and West Virginians coming into the area this week, and once these miners hear that Westmoreland is firing people, they'll very likely be very upset." I told Mr. Church, "You've got it wrong. First of all, we're not going to fire anybody. We have people that are going to have two-day suspensions." He said, "Same difference." *He said, "It's hard to tell what these people from Ohio and West Virginia will do if they hear you're doing that." I asked him if he was threatening me with setting up a picket line, and he said, "All I can tell you is you never can tell what these Ohio and West Virginians will do." He said, "I can tell you that you won't have a legal issue; you won't have anything you can take to Judge Williams."* Q. Do you know what he meant by that?
A. I assume he meant that I wouldn't have a local issue; it would be something other than a local issue, and I would have no grounds to get a TRO, temporary restraining order.

(Emphasis added.)

On July 24, the day the suspensions were to begin, "stranger pickets" appeared, and Westmoreland's miners did not report to work. On the same day, Westmoreland filed a complaint under section 301 of the Labor Management Relations Act, 29 U.S. C.A. § 185, seeking a temporary restraining order against violations of the labor agreement's arbitration provisions. Following an *ex parte* hearing on July 24, the court issued a temporary restraining order directing the Union to end the work stoppage. Later, in an amended complaint seeking injunctive relief, Westmoreland alleged:

> The defendants' strike on July 24–25, 1989, involved a matter or dispute required by the Contract to be settled by the grievance procedure set forth therein, in that it involves work day suspensions, 2 days in length, for three (3) Union employees at the Company's Bullitt Mine Complex.... Over 30 additional employees also will be scheduled for 2–day work suspensions as a result of their illegal strike activities. Given the defendants' continual strikes over the past four months, the Company's disciplinary measures will undoubtedly spawn repeated work stoppages. The Company, however, stands ready to comply with and follow those bargained for dispute resolution procedures concerning these disputes over work suspensions or any such dispute of a local nature.

The temporary restraining order was twice extended to remain in effect pending two evidentiary hearings on Westmoreland's motion for a preliminary injunction.[3]

Following the hearings, the court determined that an injunction was warranted under section 301 and that unusual circumstances justified prospective relief. The injunction ordered Westmoreland to (1) arbitrate any disputes arising under the collective bargaining agreement, "including any discipline imposed on employees for their participation in prior illegal work stoppages" and (2) postpone scheduling additional suspensions "until currently pend-

---

**3.** The district court consolidated this action with a second action brought by the NLRB seeking an injunction under section 10(*l*) to prevent District 28 from engaging in additional sympathy strikes against Westmoreland. The district court considered both actions together in two subsequent hearings. The court abstained from exercising its jurisdiction to issue the requested 10(*l*) injunction and stayed the NLRB action. The court reasoned that such an order might conflict with a section 10(*l*) injunction against District 28 emanating from the Southern District of West Virginia on June 26, 1989.

ing grievances bearing on the propriety of that discipline have been determined by an arbitrator." The injunction ordered the Union and its agents, officers, servants, employees, attorneys, members, and those acting in concert with them (1) to submit disputes governed by the collective bargaining agreement to the "arbitration procedure of that agreement" and, (2) in the event of a dispute as to whether further disputes were within the scope of this injunction, to "seek appropriate declaratory relief as to the scope of this Order." The injunction enjoined them from (1) "engaging in any work stoppages over any differences or local trouble, concerning either (a) the discipline of employees for excessive absenteeism and/or for participation in illegal work stoppages, and/or (b) any other local issues currently in dispute ..., which the parties are contractually obligated to arbitrate," (2) "[c]ommunicating ... in any manner to express or infer that a work stoppage against or involving [Westmoreland] is in progress," and (3) "[i]nducing, instructing, persuading or encouraging [Westmoreland's] employees ... to engage in a work stoppage." In the event of future work stoppages, the injunction ordered District 28, the local unions, and their respective officers to (1) "[p]roceed immediately to the areas where the work stoppages are taking place and instruct those engaging in the work stoppages ... to cease and desist from such violations of this Preliminary Injunction," (2) "[c]onduct meetings to inform their members that such work stoppages violate this Preliminary Injunction," and (3) place "advertisements on area radio stations instructing ... Union members to return to work." This appeal followed.

## II.

Section 4 of the Norris–LaGuardia Act sharply curtailed the authority of courts to issue restraining orders or injunctions against unions or their members for participation in a strike arising out of a labor dispute. 29 U.S.C.A. § 104 (West 1973).

"Congress adopted this broad prohibition to remedy the growing tendency of federal courts to enjoin strikes by narrowly construing the Clayton Act's labor exemption from the Sherman Act's prohibition against conspiracies to restrain trade." *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 708, 102 S.Ct. 2672, 2678, 73 L.Ed.2d 327 (1982) (citations omitted). The Supreme Court has consistently interpreted the anti-injunction provisions of the Norris–LaGuardia Act broadly and has recognized exceptions only to accommodate paramount federal policies. *Id.; see, e.g., Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 249–53, 90 S.Ct. 1583, 1591–94, 26 L.Ed.2d 199 (1970).

The scope of the *Boys Markets* exception to the Norris–LaGuardia Act, as refined in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), and *Jacksonville Bulk Terminals*, is the issue presented here. Under appropriate circumstances, the *Boys Markets* exception allows federal courts to issue injunctions to enforce mandatory arbitration procedures of collective bargaining agreements. The Supreme Court recognized this exception to the anti-injunction provisions of the Norris–LaGuardia Act after certain provisions of section 301(a) of the Labor Management Relations Act were enacted[4] and because of the strong federal policy favoring the use of arbitration to resolve labor disputes. *See United Steelworkers v. American Mfg.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

In *Boys Markets*, the union demanded that non-union employees cease performing tasks claimed by the union to be union work and struck when the demand was refused. This dispute was subject to a grievance and arbitration clause contained in the collective bargaining agreement be-

---

**4.** Section 301(a) authorizes federal courts to hear "[s]uits for violation of contracts between an employer and a labor organization." 29 U.S.C.A. § 185(a).

tween the union and the company. The strike also clearly violated the no-strike clause of the existing contract between the union and the company. The Supreme Court held that limited use of equitable remedies was appropriate and thus the union could be enjoined from striking over a dispute that it had agreed to arbitrate in its collective bargaining agreement. *Boys Markets,* 398 U.S. at 252–53, 90 S.Ct. at 1593–94.

The *Boys Markets* exception was refined by the Supreme Court in *Buffalo Forge.* There, members of a union other than the Steelworkers' Union went on strike at Buffalo Forge. The Steelworkers, a party to a collective bargaining agreement that included a grievance procedure and a no-strike clause, refused to cross a picket line. Buffalo Forge filed an action under section 301 to enjoin the strike pending arbitration. The Court held that the Norris–LaGuardia Act barred injunctive relief. Noting that the strike was a sympathy strike, the Court stated that "neither its causes nor the issue underlying it was subject to the settlement procedures provided by the contracts.... " *Buffalo Forge,* 428 U.S. at 407–08, 96 S.Ct. at 3147–48. The Court emphasized that for a work stoppage to be subject to an injunction under section 301, it must have arisen "over an arbitrable dispute." *Id.* at 408–09 n. 10, 96 S.Ct. at 3148–49 n. 10.

In *Jacksonville Bulk Terminals,* the employer sought to enjoin a politically motivated work stoppage. The employer argued that a *Boys Markets* injunction was proper because the work stoppage violated certain management rights clauses in the collective bargaining agreement and was thus an arbitrable dispute. The Court rejected this argument, noting that the strike was called to protest the Soviet invasion of Afghanistan. The Court stated that "[t]he 'underlying' disputes concerning the management-rights clause ... simply did not trigger the work stoppage. To the contrary, the applicability of these clauses to the dispute, if any, was triggered by the

work stoppage itself." *Jacksonville Bulk Terminals,* 457 U.S. at 721, 102 S.Ct. at 2685.

## III.

### A.

The issuance of a preliminary injunction is committed to the sound discretion of the district court and is subject to reversal only when an abuse of discretion is shown. *Conservation Council of North Carolina v. Costanzo,* 505 F.2d 498, 502 (4th Cir.1974). A party seeking a preliminary injunction is not required to establish an absolute right to the relief requested, but "need establish only 'probable right'" to that relief.[5] *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232, 235 (4th Cir.1971) (quoting *Sinclair Refining Co. v. Midland Oil Co.,* 55 F.2d 42, 45 (4th Cir.1932)); *see also Lever Bros. Co. v. International Chem. Workers Union, Local 217,* 554 F.2d 115, 119–20 (4th Cir.1976) (applying this burden of persuasion to *Boys Markets* injunction). However, because the Norris–LaGuardia Act limits the jurisdiction of district courts to issue injunctions, our inquiry regarding the jurisdiction of the district court to issue the injunction under the *Boys Markets* exception is a legal one. Thus, we review the jurisdictional issue de novo and apply the standard of review of *Costanzo* and the burden of persuasion enunciated in *Island Creek Coal Co.* to determine whether the exercise of that jurisdiction to issue a preliminary injunction was proper.

### B.

The Union argues that the July 24–25 work stoppage was not subject to a *Boys Markets* injunction because it was not "triggered" by an arbitrable dispute. The Union contends that the underlying cause of the July 24–25 work stoppage was the

---

**5.** The presence of the other three factors pertinent to issuance of a preliminary injunction— the threat of irreparable injury to the plaintiff should preliminary injunctive relief be denied, injury to other parties should the injunction issue, and the interests of the public—is not challenged by the Union. *See Costanzo,* 505 F.2d at 502.

preceding sympathy strikes.[6] Westmoreland contends that the July 24–25 work stoppage was designed to force it to forgo arbitration and to acquiesce to the Union's demand that it not discipline the employees who participated in the sympathy strikes.

In *Cedar Coal Co. v. United Mine Workers,* 560 F.2d 1153 (4th Cir.1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978), we summarized this causation issue as being a question of whether "the object of the strike at hand [was] to compel the company to concede an arbitrable issue." *Id.* at 1170. Applying the *Cedar Coal Co.* test, the district court had jurisdiction to issue a *Boys Markets* injunction. The July 24–25 work stoppage followed Church's July 22 telephone call in which he warned Jackson not to discipline employees for participating in the sympathy strikes, a subject clearly covered by the collective bargaining agreement and thus a matter for arbitration. And, although the Union attempted to camouflage the nature of this work stoppage by using "stranger pickets," there was sufficient evidence to support the conclusion of the district court that the purpose of the July 24–25 strike was to coerce Westmoreland into abandoning its disciplinary procedures against the three employees.

The Union argues that the district court could not issue a *Boys Markets* injunction because it failed to make a factual finding that the work stoppage was triggered by an arbitrable dispute. The Union seizes on the following language in the preliminary injunction that it contends is insufficient: "[T]he Defendant Local Unions have engaged in and are likely to engage in strikes in the future, where the *reputed* cause of such work stoppages is a matter required to be settled by said grievance procedure...." (Emphasis added.) The Union contends that the use of the term "reputed" demonstrates that the court failed to make the essential finding of fact that the July 24–25 work stoppage was *actually* triggered by an arbitrable dispute. In the same sentence, however, the court stated

that "the members of the defendant Locals have violated and are likely to violate the collective bargaining agreement voluntarily made by and for them not to strike over such matters...." Assuming such a finding is required prior to issuing a *Boys Markets* injunction, it is clear that it was made here.

**C.**

■ The Union also argues that there was insufficient evidence to link the statements of Church on July 22 to District 28 or other branches or individuals in the Union. In support, the Union cites *Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). However, *Carbon Fuel Co.* is distinguishable. There, the Supreme Court held that an international union which neither instigates, supports, ratifies, nor encourages "wildcat" strikes by local unions cannot be held liable for the actions of the locals. *Id.* at 213–16, 100 S.Ct. at 412–14. The Court was careful to distinguish the situation in *Carbon Fuel Co.* from one in which a local union takes actions, authorized by the parent union, which violate a contract. *Id.* at 216 n. 5, 100 S.Ct. at 413 n. 5.

This distinction is present here. Because of the participation by out-of-state, "stranger pickets," the July 24–25 work stoppage does not appear to have been the unilateral action of Church or District 28. Furthermore, Union officials such as Richard Trumka and Cecil Roberts, the Vice President of the Union, publicly endorsed, encouraged, and supported work stoppages. Mindful that Westmoreland need only establish a probable right to relief, we cannot say that the evidence was insufficient to support the conclusion of the district court that the work stoppage on July 24–25 was likely undertaken with the knowledge and support of the Union and its officers, agents, and employees.

**IV.**

■ The Union further contends that the district court exceeded its authority by is-

---

**6.** Westmoreland concedes that the district court did not have authority under *Boys Markets* to

enjoin the sympathy strikes.

suing an injunction that prohibited similar work stoppages in the future, contending that the *Boys Markets* exception does not extend to the grant of prospective injunctive relief. *See United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236 (5th Cir.1975), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). Alternatively, the Union asserts that if prospective relief is authorized, it cannot be granted unless the district court finds that the Union has exhibited an established pattern or practice of striking over arbitrable disputes. *See United Parcel Serv. (New York), Inc. v. Local 804, Int'l Bhd. of Teamsters,* 698 F.2d 100, 110–11 (2d Cir. 1983); *Southern Ohio Coal Co. v. United Mine Workers,* 551 F.2d 695, 708–09 (6th Cir.), *cert. denied,* 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155 (1977); *United States Steel Corp. v. United Mine Workers,* 534 F.2d 1063, 1077 (3d Cir.1976).

Westmoreland contends that issuing a prospective *Boys Markets* injunction is authorized, even without a pattern of work stoppages, when a court determines that the Union employs the device of work stoppages "with questionable motivation and little justification," *Old Ben Coal Corp. v. Local Union No. 1487 of United Mine Workers,* 500 F.2d 950, 952 (7th Cir.1974), or when the evidence presented demonstrates "an unlawful proclivity on the part of the Union to pursue a course of conduct in violation of the agreement of the parties." *CF & I Steel Corp. v. United Mine Workers,* 507 F.2d 170, 176–77 (10th Cir. 1974) (footnote omitted). The authority of a district court to grant prospective *Boys Markets* relief presents an issue of first impression in this circuit.

The Fifth Circuit is the only circuit that has held prospective injunctive relief exceeds the scope of the *Boys Markets* exception and is thus inconsistent with the Norris–LaGuardia Act. *United States Steel Corp.,* 519 F.2d 1236, addressed the question of whether repeated and ongoing work stoppages over arbitrable issues authorized the court to issue an injunction prohibiting all future work stoppages during the life of the contract. The court held that prospective relief constituted an overbroad use of the injunction and was "the very evil Norris–LaGuardia sought to remedy. It is not every strike which is enjoinable under *Boys Markets,* nor even every strike over an arbitrable issue." *Id.* at 1245. The court held that "[t]he carefully drawn guidelines in *Boys Markets* clearly call for case-by-case adjudication." *Id.* This rationale flows from the Fifth Circuit's view that prospective relief conflicts with section 9 of the Norris–LaGuardia Act which states that labor injunctions may contain only a prohibition of those acts described in the complaint. 29 U.S.C.A. § 109.

Other circuits, however, have read section 9 less strictly. *See United Parcel Serv. (New York), Inc.,* 698 F.2d at 110; *Southern Ohio Coal Co.,* 551 F.2d at 707–10; *United States Steel Corp.,* 534 F.2d at 1077; *CF & I Steel Corp.,* 507 F.2d at 176–77. We find the rationale of these decisions persuasive and hold that in limited circumstances district courts may issue prospective *Boys Markets* injunctions.

As noted by the Union, however, the Second, Third, and Sixth Circuits require the district court to find that the Union has engaged in a pattern or practice of striking over arbitrable issues before prospective relief can be granted. The Union urges us to adopt a pattern or practice requirement.[7] The Seventh and Tenth Circuits, on the other hand, do not require the employer to demonstrate a pattern or practice as a prerequisite to obtaining relief in the form of a prospective injunction. Rather, they base the decision of whether to issue a prospective injunction on whether the behavior of the Union indicates future noncompliance with the arbitration provisions of the collective bargaining agreement is likely. *See*

---

7. Arguing that no pattern or practice is present here, the Union points out that only the July 24–25 work stoppage allegedly occurred over an arbitrable difference and that the preceding sympathy strikes did not arise out of an arbitrable dispute. The Union reasons that assuming the July 24–25 work stoppage arose out of an arbitrable dispute, it alone cannot establish a pattern.

*CF & I Steel Corp.*, 507 F.2d at 176–77; *Old Ben Coal Corp.*, 500 F.2d at 952.

In our view, the pattern requirement is but one way that the possibility of future noncompliance may be indicated. The dissenting opinion in *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting), principles of which were specifically adopted in *Boys Markets*, 398 U.S. at 253–54, 90 S.Ct. at 1594–95, states that after determining that the strike to be enjoined is over an arbitrable dispute, "the District Court must ... consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed." Thus, if a future breach is threatened, prospective relief is appropriate. We are not inclined to restrict the authority of district courts to grant the equitable relief of narrowly tailored prospective injunctions in situations when there is a reasonable probability that future breaches will be committed, even in situations when no pattern has emerged.

■ Here, there was a threat of future violations. In response to the suspension of three employees, the Union brought in "stranger pickets" who caused a work stoppage at Westmoreland. Additionally, the comments of Church indicate that "stranger pickets" were used for the purpose of disguising the true nature of the July 24–25 work stoppage. We believe this demonstrates that the Union knew it was obligated to arbitrate before it instituted the strike and yet flagrantly disregarded this obligation. Given this, and the fact that the discipline of 30 additional employees was pending, there was a reasonable probability that the Union would initiate additional work stoppages in response to disciplinary action against the employees. Thus, the decision to grant prospective relief, narrowly circumscribed to prevent future strikes over the disciplinary action taken against these particular employees—strikes that violate the obligation of the Union to arbitrate such disputes under its collective bargaining agreement—was supported by the record.

## V.

■ The Union contends that the preliminary injunction was overbroad and violates section 9 of the Norris–LaGuardia Act. We agree.

Section 9 of the Norris–LaGuardia Act, which must be accommodated with section 301 of the National Labor Relations Act, applies to *Boys Markets* actions. *See United States Steel Corp.*, 534 F.2d at 1076; *Bituminous Coal Operators' Ass'n, Inc. v. International Union, United Mine Workers*, 585 F.2d 586, 599 (3d Cir.1978); *see generally District 29, United Mine Workers v. New Beckley Mining Corp.*, 895 F.2d 942, 944 (4th Cir.1990) ("The Norris–LaGuardia Act severely limits the jurisdiction of federal courts to issue ... injunctions in labor disputes.") (citation omitted). Section 9 states that injunctions growing out of labor disputes shall include "only a prohibition of such specific act or acts as may be expressly complained of in the ... complaint." *See* 29 U.S.C.A. § 109.

Westmoreland's complaint alleged that the strike on July 24–25 was over the discipline administered to three employees and, in part, it stated specifically: "Over 30 additional employees also will be scheduled for 2–day work suspensions as a result of their illegal strike activities.... [T]he Company's disciplinary measures will undoubtedly spawn repeated work stoppages." The specific allegations in Westmoreland's complaint justified prospective relief only for the narrow purpose of enjoining strikes arising as a result of the scheduled 2–day work suspensions.

Section 9 serves to prevent district courts from issuing overbroad prospective injunctions. Employers seeking prospective *Boys Markets* relief must support their plea with allegations of specific acts, supported by the facts, that will give rise to future breaches of a binding arbitration agreement. For example, here, the injunction should have been limited to enjoining future work stoppages arising in response to the disciplinary action taken against the

employees who participated in the July 24–25 work stoppage. The injunction, however, went beyond this and impermissibly enjoined other behavior. To the narrow extent that it enjoins conduct related to potential work stoppages occurring in response to disciplinary action taken by Westmoreland against the employees referred to in its complaint, we affirm the injunction. We vacate the remaining portions of the injunction and remand with instructions to the district court to modify the terms of its injunction consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

SPROUSE, Circuit Judge, dissenting:

I dissent. Since, however, my disagreements with the majority opinion relate primarily to application of well-settled law to discrete circumstances, I see no reason to write a lengthy dissenting opinion.

The district court did not, as required, factually find that the involved work stoppage was caused by an arbitrable dispute. The language of its order negates such a finding; *i.e.,* "the Defendant Local Unions have engaged in and are likely to engage in strikes in the future, where the *reputed* cause of such work stoppages is a matter required to be settled by said grievance procedure...." (Emphasis added.) This language states only an allegation that the work stoppage involved a matter requiring settlement through grievance proceedings. From the order's silence following the statement of the allegations, it is self-evident that the factual issue raised by the allegation was not resolved by the court. Be that as it may, the work stoppage was unquestionably "triggered" by "stranger" pickets—an activity expressly outside the exceptional *Boys Markets* injunction. *Jacksonville Bulk Terminals v. International Longshoremen's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982); *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976).

Additionally, in my view, the *Boys Market* exception does not permit injunctions against prospective actions except for relief against conduct proscribed by the *Boys Market* rule itself. *See United States Steel Corp. v. United Mine Workers,* 519 F.2d 1236 (5th Cir.1975), *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976).